# UNITED STATES v. BETHLEHEM STEEL COMPANY.

## APPEAL FROM THE COURT OF CLAIMS.

No. 188.  Argued January 28, 29, 1907.—Decided March 11, 1907.

The rule that prior negotiations are merged in the contract is general in its nature and does not preclude reference to letters between the parties prior to the execution of a contract in order to determine whether from the language used in the contract the parties intended stipulated deductions for delay as a penalty or as liquidated damages.

Where in response to. Government advertisements the same party submits different bids, the largest price being for the shortest time of delivery, the acceptance of the bid for the shorter time is evidence that the element of time is of essence, and a stipulated deduction of an amount per day equivalent to. the difference between the short and long time for delivery is to be construed as liquidated damages for whatever delay occurs in the delivery, and not as a penalty, although the word penalty may have been used in some portions of the contract.

41 C. Cl. 19, reversed.

THE Bethlehem Steel Company recovered a judgment in the Court of Claims (41 C. Cl. 19) for the sum of $21,000 against the appellant, from which judgment the United States has appealed to this court.

The company filed its petition in the Court of Claims seeking to recover a balance which it alleged was due from the United States on a contract, which had been entered into by the company with Brigadier General Flagler, Chief of Ordnance, in behalf of and for the United States, for the construction of certain gun carriages, which the company alleged had been constructed according to the contract and for which the Government had failed to pay the full amount which became due upon its performance.

The facts were found by the Court of Claims, from which it appears that the Government on the eighth day of March, 1898, advertised for proposals for the construction of six disappearing gun carriages, and the specifications accompany-

ing the advertisement set forth the character and extent of the work. The claimant, in response to the advertisement, submitted four distinct sealed proposals to the War Department for the construction of such carriages. By the first proposal the company agreed to furnish five or more gun carriages for the sum of $31,000 each, the first to be delivered within six months of the date of contract, to be followed by two carriages every three months thereafter. By the second proposal the company offered to furnish the same number for the sum of $33,000 each, the first to be delivered within five months from date of contract, to be followed at the rate of one carriage every month thereafter. By the third proposal the offer was to furnish the same number for the sum of $35,000 each, the first to be delivered within four months, and the second within five months of date of contract; the remaining carriages to follow at the rate of three carriages every two months thereafter. By the fourth proposal the offer was to furnish the same number for the sum of $36,000 each, the first to be delivered in four months, the second in five months, and the remaining carriages at the rate of two carriages every month thereafter.

These alternative proposals were made in consequence of a letter written the company by the Chief of Ordnance, dated March 11, 1899, of which the following is a copy:

"Office of the Chief of Ordnance,
                    "United States Army,
                        "Washington, March 11, 1898.
"Gentlemen: It is suggested that in making bids for carriages you estimate, first on the price of carriages under the supposition that the works will run for twenty-four hours; second, that later, if it be found advantageous, the ordinary working hours may be observed. It is considered best that bids should be made for carriages by numbers, as, for instance, so much for five 8-inch carriages, for six, eight, etc. Therefore it is considered judicious that bids should be made for rapid

delivery of a certain number of carriages or for less rapid delivery of the same. It should be understood, however, that time will be considered very important.

"Respectfully,                    D. W. FLAGLER,
        *"Brig. Gen., Chief of Ordnance."*

The following are the further findings of the Court of Claims:

"IV. The defendants, through the War Department, accepted proposal No. 4 of the claimant company.

"V. In drawing up the contract between the United States and the claimant company a slight modification of proposal No. 4 was decided upon, which was as follows:

"Whereas in proposal No. 4 claimant company was to deliver five or more carriages, the first in four months, the second in five months, and the remaining ones to follow at the rate of two carriages per month. In drawing up the contract this was changed so as to provide for the delivery of one carriage in four months (as proposed) and five carriages in six months from the date of contract, thus reducing the time of delivery of all the carriages from seven to six months, this reduction of the total delivery being offset by the increased latitude given claimant company as to intermediate deliveries.

"VI. On April 4, 1898, the Ordnance Department transmitted a form of contract of even date to the claimant company for execution and return by letter, as follows:

" 'Office of the Chief of Ordnance,
        " 'United States Army,
            " 'Washington, April 4, 1898.
" 'The Bethlehem Iron Co., South Bethlehem, Pa.

" 'Gentlemen: I am instructed by the Chief of Ordnance to transmit herewith contract, in quintuplicate, dated the 4th instant, for six 12-inch disappearing gun carriages, model 1896, for execution and return to this office.

" 'Respectfully,                    R. BIRNIE,
        " '*Capt., Ord. Dept., U. S. A.*'

"To this letter the claimant company made reply on April 5, 1898:

" 'The Bethlehem Iron Company,
" 'South Bethlehem, Pa., April 5, 1898.
" 'Chief of Ordnance, U. S. A.,
" 'War Department, Washington, D. C.
" 'Sir: We have examined the contract forms, covering six disappearing gun carriages, model 1896, for 12-inch B. L. rifles, for which we submitted proposals under the date 19th ultimo, and write to call your attention to the third clause, relating to our liability on account of any patent rights granted by the United States, is not struck out, as has been done in the case of previous contracts for carriages.

" 'We also note that the penalty mentioned in the contract for each day of delay in delivery of each carriage is $75 instead of $10, as is stipulated in the instructions to bidders and specifications.

" 'We made our bid under the understanding that the penalty for non-delivery was to be $10 per day, and we respectfully request that the contract forms may be modified in accordance with this understanding.

" 'We return herewith the contract forms, and remain,
" 'Respectfully,
" 'THE BETHLEHEM IRON COMPANY,
" 'R. W. DAVENPORT,
" 'Second Vice President.'

"Whereupon the claimant company was informed by the Chief of Ordnance, by letter of April 9, 1898, as follows:

" 'Office of the Chief of Ordnance,
" 'United States Army,
" 'Washington, April 9, 1898.
" 'The Bethlehem Iron Company,
" 'South Bethlehem, Pa.
" 'Gentlemen: In reply to your letter of April 5, 1898, returning contract forms, I have the honor to inform you that

your request in regard to your liability on account of patent rights has been complied with and the third paragraph has been stricken out.

" 'In regard to the penalty for delay in delivery being $75 per day instead of $10 per day, I have to state that the former amount is the average difference in time of delivery between your price recently bid for slow delivery of these carriages and the price under the accepted bid. The department feels it to be just that this average difference should be the prescribed penalty; but, if you should prefer, instead of taking the average difference, that the exact difference per day for each particular carriage should be prescribed, the forms will be altered accordingly.

" 'The contracts are returned, hoping this explanation will be satisfactory.

" 'Respectfully,              D. W. FLAGLER,
" '*Brigadier General, Chief of Ordnance.*'

"Thereafter it was found that an error had been made in the above computation, in that the $75 per day deduction provided for should have been $35 instead, and the claimant company was duly informed of this by letter dated April 16, 1898, which is as follows:

" 'Office of the Chief of Ordnance,
" 'United States Army,
" 'Washington, April 16, 1896.
" 'The Bethlehem Iron Company,
" 'South Bethlehem, Pa.
" '(Through the Inspector of Ordnance, U. S. A.)

" 'Gentlemen: Referring to my letter, No. 21985, of the 9th instant, I would invite your attention to the fact that an error was made in the computation in the amount of the deduction in price per day of delay in delivery of 12-inch disappearing carriages, L. F., model of 1896, recently ordered from you, and to inform you that the contract should read that such deduction in price should be $35 per day of delay in

delivery, in accordance with principle stated in my above-mentioned letter.

"Respectfully,                  D. W. FLAGLER,
    " 'Brigadier General, Chief of Ordnance.'

"Before signing the contract in its present form the claimant company, by communication on April 20, 1898, requested that the same should be modified in some respects, which request is contained in the following communication:

                        " 'The Bethlehem Iron Company,
                " 'South Bethlehem, Pa., April 20, 1898.
" 'Chief of Ordnance, U. S. A.,
                " 'War Department, Washington, D. C.

" 'Sir: Referring to the forms of contract for six 12-inch disappearing gun carriages, carrying the date of April 4, 1898, which have recently been received, but not yet executed, and to the conversation which the writer had with you on Thursday last, we beg to state that on further carefully considering the possibilities of the case we do not believe that we will be able to deliver the six carriages within six months, as called for by the proposed contract. We will, however, undertake to complete, in accordance with our bid, the delivery of the first carriage in four months, the second within five months, and the remaining four at the rate of two per month; thus making the total time of delivery of the six carriages seven instead of six months, it being understood that no penalty will be charged against us for the one month of delay which will thus accrue on the fifth and sixth carriages.

" 'By agreeing to this proposition the department will be the gainer, in that the second carriage will be due at the end of the fifth month, while, as the contract now reads, it would not be due until the end of the sixth month.

" 'With the above understanding confirmed, we will execute the contract as it now stands, except as to the amount of penalty for delay in delivery, which, in accordance with your letter of April 16, will be $35 instead of $75 per day.

" 'We return the contract forms in order that the change as regards penalty may be made.

" 'We remain, respectfully,

" 'THE BETHLEHEM IRON COMPANY,

" 'R. W. DAVENPORT,

" '*Second Vice President.*'

"To which letter the following reply was made:

" 'Office of the Chief of Ordnance,

" 'United States Army,

" 'Washington, April 25, 1898.

" 'The Bethlehem Iron Company,

" 'South Bethlehem, Pa.

" '(Through Inspector of Ordnance, U. S. A.)

" 'Gentlemen : In reply to your letter of the 20th instant, I have the honor to inform you that the schedule of deliveries of 12-inch disappearing carriages contained therein will, in view of the earlier resulting delivery of the second carriage, be accepted in lieu of the schedule in the contract, without enforcement of penalties which would result from the change of schedule.

" 'The amount of the penalty for delay in delivery is changed from $75 to $35 per day in accordance with my letter of the 16th instant, and the contract forms are returned herewith for execution.

" 'Respectfully,          D. W. FLAGLER,

" '*Brigadier General, Chief of Ordnance.*'

"The above correction was therefore made in the said contract, and the same was duly signed and executed by the claimant company and immediately transmitted to the War Department. A copy of said contract is annexed to and made part of the petition."

The following are the material portions of the contract:

" Under advertisement dated          , 189 , the said parties of the first part do hereby contract and engage with the said

United States to manufacture, for the Ordnance Department, U. S. Army, in accordance with said instructions to bidders as amended, specifications and drawings, all of which are hereto attached and form part of this contract.

"Six (6) disappearing gun carriages, model 1896, for 12-inch B. L. rifles, drawings dated April 27 and June 19, 1896 (latest revision July 14 and December 30, 1897), at thirty-six thousand dollars ($36,000) each, free on board cars at South Bethlehem, Pa.

"The first carriage to be delivered within four (4) months from date of this contract, and the remaining five (5) carriages within six (6) months from date of this contract.

"It is further stipulated and agreed that the party of the first part will furnish such limited additional number of these carriages, at the price and rate of delivery stated, as the party of the second part may desire, under available appropriations.

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

"It is further stipulated and agreed that if any carriage herein contracted for is not delivered by the party of the first part at the times specified herein, there will be deducted. in the discretion of the Chief of Ordnance, thirty-five ($35) dollars per day from the price to be paid therefor for each day of delay in delivery of each carriage, respectively. But if at any time the Chief of Ordnance shall decide that continuous and great delay or other serious default has occurred, he may, to protect the interests of the United States, apply the provisions of the 5th section of the regular contract form and waive further per diem deduction in price.

"All penalties incurred under this contract shall be offset against any payments falling due to the said party of the first part.

"The work must pass the required inspection at all stages of its progress, and be approved by the officers of the Ordnance Department before being accepted and paid for by the United States.

"(Signed by the parties.)

\*    \*    \*    \*    \*    \*    \*.    \*

"VII. Thereupon the Bethlehem Iron Company-proceeded to manufacture the said gun carriages, and ultimately delivered them to the United States, and they were accepted by the latter. The following table gives, first, the date fixed by the said contract for the delivery of each one of said carriages; second, the date of its delivery, and, third, the extent of the delay in its delivery.

| Number of carriage. | Date for delivery fixed by contract. | Date of delivery (actual). | Extent of delay. |
|---|---|---|---|
| 16 | August 4, 1898............ | January 28, 1899....... | 177 days. |
| 17 | September 4, 1898......... | March 6, 1899......... | 183 " |
| 18 | October 4, 1898........... | April 13, 1899......... | 191 " |
| 19 | October 4, 1898........... | March 18, 1899........ | 165 " |
| 20 | November 4, 1898......... | April 29, 1899........ | 176 " |
| 21 | November 4, 1898......... | May 27, 1899.......... | 204 " |
| | Total delay.......... | ................... | 1,096 days. |

"Of the above days of delay, which amounted in the aggregate to 1,096 days, the United States, through the Chief of its Bureau of Ordnance, decided that the Bethlehem Iron Company was responsible for delays to the extent of 100 days upon each of the six disappearing gun carriages, or 600 days in all, but did not charge said company with the balance of said days, or 496 days in all; which, at the stipulated sum of deduction at $35 per day for each day of delay in the delivery of each gun carriage, amounted to the sum of $21,000, which sum was deducted from the payments made the claimant company, and the balance, or the sum of $195,000, was paid over to the claimant company, who receipted for said payment under protest.

"VIII. The court finds as the ultimate fact that the defendants' officers hindered and delayed the claimant in the performance of the work by changes in the plans of construction, as alleged in the petition, and in various other ways; but the court also finds that the claimant contributed to the delay

in the completion of the work by being insufficiently equipped and prepared to complete it within the time prescribed in the contract and by taking other work to the exclusion of that referred to in these findings; and the court further finds that the transactions in the process of manufacture were so involved and intermerged that it is impossible, on the evidence produced, for the court to ascertain and determine whether the defendants should be charged with a greater proportion of the delays set forth in the foregoing table in Finding VII than those assumed by the defendants' officers, to wit, 496 days out of the total amount of delays, to wit, 1,096 days.

. "It does not appear that the defendants were ready to use the gun carriages hereinbefore described at the time when they were finally delivered by the claimant; nor does it appear that they could have used them on their fortifications if they had been delivered at an earlier day. Nor does it appear that the defendants suffered any injury or damage whatever by the delay of the claimant in delivering the said gun carriages hereinbefore set forth.

## "Conclusion of law.

"Upon the foregoing findings of fact the court decides, as a conclusion of law, that the claimant recover judgment in the sum of twenty-one thousand dollars ($21,000)."

*The Attorney General* and *Mr. Assistant Attorney General Van Orsdel,* with whom *Mr. Franklin W. Collins* was on the brief, for appellant:

Time was of the essence of the contract. Time may be of the essence of a contract for the sale of property. *Taylor* v. *Longworth,* 14 Pet. 172; *Jones* v. *United States,* 96 U. S. 24, *Secombe* v. *Steel,* 20 How. 94–104; *Brown* v. *Guaranty Trust Co.,* 128 U. S. 403. In this case it was an all-important consideration, was so represented in the advertisements and the instructions to bidders, and was so treated by the appellee in its proposals and in the contract itself.

The *per diem* deductions were not penalties, and, though referred to as such in the contract neither the Government nor the court in its interpretation of the contract is to be concluded by the use of the technical term "penalty." *Davis and Davidson* v. *United States,* 17 C. Cl. 201; cited with approval in *Halladay* v. *United States,* 35 C. Cl. 453; also in *Edgar Thompson Works* v. *United States,* 34 C. Cl. 218.

Courts have frequently held the sum stipulated to be paid on breach of the agreement to be, from the nature of the case, a penalty, notwithstanding the strongest language showing the intention of the parties to be that it should be paid in full as liquidated damages. *Boys* v. *Ancell,* 5 Bing. (N. Car.) 391; *Davies* v. *Penton,* 6 B. & C. 216; *Horner* v. *Flintoff,* 9 M. & W. 678; *Reindel* v. *Shell,* 4 C. B. (N. S.) 97.

On the other hand, cases are numerous in which the parties have used the term "penalty" which seems on its face to import a forfeiture rather than a valuation of damage, yet the courts have held that the stipulated sum was, from the very nature of the case, to be considered as liquidated damages and recoverable in full. *Sainter* v. *Ferguson,* 7 C. B. 716; *Leighton* v. *Wales,* 3 M. & W. 545; *Sparrow* v. *Paris,* 7 H. & N. 594.

On the other hand, a contract for a "penalty" may appear from the context to be a contract for "liquidated damages," and may be so treated. Page on Contracts, 1905, § 1172; *Robinson* v. *Aid Society,* 68 N. J. L. 723; *Illinois Central Ry.* v. *Cabinet Co.,* 104 Tennessee, 568; *Clark* v. *Barnard,* 108 U. S. 436; *Jacqua* v. *Heddington,* 114 Indiana, 309.

Where the contract calls for a *per diem* deduction as the measure of injury, in the event of the occurrence of a specified contingency, and the sum agreed upon does not appear unreasonable upon the face of the contract, and the actual damages are impossible of ascertainment, and no fraud or duress has been practiced to induce either party to enter into the contract, and the sources of information are open alike to

both parties, the court should hold that the sum stipulated is
the agreed measure of damages.

*Mr. James H. Hayden* for appellee:

The contract in suit is free from ambiguity and the par-
ties are bound by it. Resort cannot he had to their transac-
tions which occurred while the contract was *in fieri*, for the
purpose of showing that they intended something different
from the import of the language employed in the instrument.
*Simpson* v. *United States*, 172 U. S. 372, 379; *Brawley* v.
*United States*, 96 U. S. 168, 173; *Van Buren* v. *Digges*, 11 How.
461, 466; *Harvey* v. *United States*, 8 C. Cl. 501, 506, 508.

If they were relevant matter, the negotiations of the par-
ties, which preceded the execution of the contract, would not
sustain the contention of the United States, to the effect that
the stipulation concerning penalty was intended to provide
for a deduction, as liquidated damages, or something else.

A review of the preliminary correspondence which passed
between the Chief of Ordnance and the Bethlehem Company
shows that the parties understood what they were doing when
they signed the contract, and that the penal clause providing
in terms for the imposition of penalty in case of the contractor's
default was framed by the Chief of Ordnance, exactly as he
wished it to be framed. The contract was drawn by him, not
by the claimant. The liability to be incurred by the con-
tractor for delay in delivering the carriages was referred to by
the Chief of Ordnance as *penalty* in letters which he directed
to the claimant on April 9, 1898, and April 25, 1898, and was
denominated *penalty* by the Bethlehem Company in its letters,
written to the Chief of Ordnance on April 5, 1898, and April 20,
1898. There is nothing to indicate that the parties attempted
to ascertain what loss the Government would suffer from delay,
or that they fixed by agreement the measure of damages to be
recovered in case of the company's default.

The contract is to be interpreted as one which provided
for a forfeiture or penalty, in case of the contractor's default.

The fact that the delay, caused by both parties, did not occasion actual damage and that a deduction made as liquidated damages, at the arbitrary rate of $35 *per diem* on each carriage, would be extortionate and lead to an unjust result, furnish sufficient reasons to sustain the judgment.

Time was not of the essence of the contract (*Taylor* v. *Longworth*, 14 Pet. 172, 174; *Jones* v. *United States*, 96 U. S. 24; *Secombe* v. *Steele*, 20 How. 94, 104 distinguished), as in those cases it was made so by express stipulation or by implication from the nature of the property and the avowed objects of the seller and purchaser. Aside from naming a period within which the gun carriages should be delivered, the contract in suit contains nothing to indicate that time was of the essence. The penal clause itself shows that the parties contemplated the possibility of delays occasioned by acts of one or both of them. Neither can it be implied from the nature of the property that time was of the essence. The conduct of the parties and the situation of the United States shows that it was not. The progress of the work was hindered by changes ordered by the Chief of Ordnance. The carriages were accepted without complaint long after the date fixed by contract for their delivery. The United States was not ready to make use of them when delivered. It could not have made use of them had they been delivered sooner. It would simply have been put to the expense of storing and caring for them.

MR. JUSTICE PECKHAM, after making the foregoing statement, delivered the opinion of the court.

It is objected on the part of the company that as the contract in question is, as asserted, plain and unambiguous in its terms, no reference can be made to other evidence or to documents which do not form part of the contract. The general rule that prior negotiations are merged in the terms of a written contract between the parties is referred to, and it is insisted that under that rule the various letters passing between the

parties prior to the execution of the contract are not admissible.

The rule that prior negotiations are merged in the contract is general in its nature, and, we think, does not preclude reference to letters between the parties prior to the execution of the contract in this case. The language employed in this contract for a deduction, in the discretion of the Chief of Ordnance, of $35 per day from the price to be paid for each day of delay in the delivery of each gun carriage, respectively, taken in connection with the subject-matter of the contract, leaves room for the construction of that language in order to determine which was intended, a penalty or liquidated damages. While it is claimed that there is really no doubt as to the proper construction of the contract, even if the contract alone is to be considered, yet we think that much light is given as to the true meaning of language that is not wholly free from doubt by a consideration of the correspondence between the parties before the final execution of the contract itself. Under such circumstances we think it never has been held that recourse could not be had to the facts surrounding the case and to the prior negotiations for the purpose of determining the correct construction of the language of the contract. *Simpson* v. *United States,* 199 U. S, 397–399. In *Brawley* v. *United States,* 96 U. S. 168–173, the court says: "Previous and contemporaneous transactions may be all very properly taken into consideration to ascertain the subject-matter of a contract and the sense in which the parties may have used particular terms."

It is not for the purpose of making a contract for the parties, but to understand what contract was actually made, that in cases of doubt as to the meaning of language actually used prior negotiations may sometimes be referred to.

There has in almost innumerable instances been a question as to the meaning of language used in that part of a contract which related to the payment of damages for its non-fulfillment, whether the provision therein made was one for liquidated

damages or whether it meant a penalty simply, the damages to be proved up to the amount of the penalty. This contract might be considered as being one of that class where a doubt might be claimed, if nothing but the contract were examined. The courts at one time seemed to be quite strong in their views and would scarcely admit that there ever was a valid contract providing for liquidated damages. Their tendency was to construe the language as a penalty, so that nothing but the actual damages sustained by the party aggrieved could be recovered. Subsequently the courts became more tolerant of such provisions, and have now become strongly inclined to allow parties to make their own contracts, and to carry out their intentions, even when it would result in the recovery of an amount stated as liquidated damages, upon proof of the violation of the contract, and without proof of the damages actually sustained. This whole subject is reviewed in *Sun Printing & Publishing Association* v. *Moore*, 183 U. S. 642, 669, where a large number of authorities upon this subject are referred to. The principle decided in that case is much like the contention of the Government herein. The question always is, what did the parties intend by the language used? When such intention is ascertained it is ordinarily the duty of the court to carry it out. See also *Clement* v. *Cash*, 21 N. Y. 253, 257; *Little* v. *Banks*, 85 N. Y. 258, 266.

The Government at the time of the execution of this contract (which was dated April 4, 1898) was making preparation for the expected war with Spain, which was imminent, and which was declared by Congress a few days thereafter. The Government was evidently desirous of obtaining the construction of these gun carriages as early as it was reasonably possible, and it was prepared to pay an increased price for speed. The acceptance of the proposal at the highest price for the delivery of the carriages in the shortest time is also evidence of the importance with which the Government officers regarded the element of speed. There can be no doubt as to its importance in their opinion, or that such opinion was

communicated to the company. In the light of this fact an examination of the language of the contract itself upon the question of deductions for delay in delivery renders its meaning quite plain. It is true that the word "penalty" is used in some portions of the contract, although in the clause providing for the $35 per day deduction that word is not used, nor are the words "liquidated damages" to be found therein. The word "penalty" is used in the correspondence, even by the officers of the Government, but we think it is evident that the word was not used in the contract nor in the correspondence as indicative of the technical and legal difference between penalty and liquidated damages. It was used simply to provide that the amount named might be deducted if there were a delay in delivery. Either expression is not always conclusive as to the meaning of the parties. *Little* v. *Banks*, 85 N. Y., *supra; Ward* v. *Hudson River Building Co.*, 125 N. Y. 230. What was meant by the use of the language in question in this case is rendered, as we think, still more certain by the manner in which the $35 per day was arrived at, as stated in the letters of the officers representing the Government, which were examined and criticised by the company before the signing of the contract. The correspondence shows that the sum was arrived at by figuring the average difference in time of delivery between the price bid for slow delivery of the carriages and the price under the accepted bid, the department saying "that this average difference should be the prescribed penalty."

Having this question before them and the amount stated arrived at in the manner known to both parties, we think it appears from the contract and the correspondence that it was the intention of the parties that this amount should be regarded as liquidated damages, and not technically as a penalty. This view is also strengthened when we recognize the great difficulty of proving damage in a case like this, regard being had to all the circumstances heretofore referred to. It would have been very unusual to allow the company to obtain the

contract for the construction of these carriages, and yet to place it under no liability to fulfill it as to time of delivery, specially agreed upon, other than to pay only those actual damages (not exceeding $35 per day) that might be proved were naturally and proximately caused by the failure to deliver. The provision under such circumstances would be of no real value. The circumstances were such that it would be almost necessarily impossible to show what damages (if any) might or naturally would result from a failure to fulfill the contract. The fact that not very long after the contract had been signed and the war with Spain was near its end, the importance of time as an element largely disappeared, and that practically no damage accrued to the Government on account of the failure of the company to deliver, cannot affect the meaning of this clause as used in the contract nor render its language substantially worthless for any purpose of security for the proper performance of the contract as to time of delivery.

The amount is not so extraordinarily disproportionate to the damage which might result from the failure to deliver the carriages, as to show that the parties must have intended a penalty and could not have meant liquidated damages. If the contract were construed as contended for by the company, it would receive (as events have turned out) the highest price for the longest time in which to deliver, which could not have been contemplated by either party. This would result from the finding that no damages in fact flowed from the failure to deliver on time.

The eighth finding of the Court of Claims is in effect that the failure to deliver was caused in part by both parties; that the total number of days failure was 1,096 days, of which 496 were caused by the defendant's officers, and it does not mean that the court regarded itself as bound by the decision of the Chief of Ordnance as to the number of days that the claimant or the Government delayed the delivery. It found the number of days as stated, and that the transactions were so involved that

whether the defendant should be charged with a greater proportion of the delays than set forth in the finding, the court could not decide on the evidence produced.

The judgment of the Court of Claims must be reversed and the cause remanded with directions to dismiss the petition.

*Reversed.*