**LEA et al. v. CITIZENS' & SOUTHERN NAT. BANK et al.**

District Court, N. D. Georgia, Atlanta Division. July 6, 1928.

No. 488.

1. **Contracts ⟺ 169—Negotiations of parties and surrounding circumstances may be shown, to ascertain meaning of doubtful words in contract.**

Where there is an ambiguity, recourse is proper to the negotiations of the parties and to all the surrounding circumstances, to ascertain the real meaning of the doubtful words.

2. **Contracts ⟺ 155—Party who wrote contract has burden of explaining ambiguity, when he seeks construction favorable to himself.**

The person who wrote the contract and was the author of ambiguity has burden of explaining it, when he seeks to take the benefit of a favorable construction, and, if he does not clear up the meaning beyond doubt, the doubt must be given against him.

3. **Corporations ⟺ 116—Contract for sale of newspaper stock, providing for determination of corporation's earnings by audit, deducting proper charges, held not to authorize deduction of reserve for unfulfilled subscriptions previously treated as asset.**

Contract for sale of stock in newspaper, containing representation of sellers as to net earnings after deducting proper charges, deductions, and reserves, and allowing buyers reductions "if earnings, as determined by said audit, be less than $20 per share," *held* not to authorize buyers' auditors to set up large reserve liability for unfulfilled subscriptions, which was deducted from net earnings, where unfulfilled subscriptions were previously treated as asset of paper, rather than liability.

In equity. Suit by Luke Lea and Rogers Caldwell against the Citizens' & Southern National Bank, in which Clark Howell and others were made defendants and ordered to answer, and defendant first named was discharged. On motion to strike the answer of the remaining defendants. Motion denied.

Reuben R. & Lowry Arnold, of Atlanta, Ga., W. E. Norvell, Jr., of Nashville, Ga., Little, Powell, Smith & Goldstein and Jones, Evins, Moore & Powers, all of Atlanta, Ga., for plaintiffs.

Howell, Heyman & Bolding and Spalding, MacDougald & Sibley, all of Atlanta, Ga., for defendants.

SIBLEY, District Judge. Luke Lea and Rogers Caldwell sued the Citizens' & Southern National Bank at law to recover possession of the certificates for 3,025 shares of the common stock of the Constitution Publishing Company, which were held in escrow by the bank under an option contract for their purchase, made between Lea and Caldwell, of the one part, and Clark Howell and others, of the other part; by the terms of which contract Lea and Caldwell claimed to have title to the stock and a right to have the certificates delivered. The bank answered that Clark Howell and his associates, hereinafter called the Howells, disputed the right asserted by Lea and Caldwell, and claimed a return of the stock to themselves and it prayed an interpleader. The case was then transferred to the equity docket, and on a hearing the bank was discharged as a party and made custodian for the court of the stock and purchase money in dispute, and the Howells were made defendants and ordered to answer instead. Their answer, as amended, Lea and Caldwell move to strike, because setting up no sufficient defense. This is the question for decision. Rejecting allegations which are mere contentions or conclusions of the pleader, the main facts set up are these:

The Howells owned 3,025 out of a total of 5,000 shares of the common stock of the Constitution Publishing Company, the publishers of the Atlanta Constitution. Lea and Caldwell sought to buy this stock. They asked for and received detailed financial statements of the company for 1926 and for the first three months of 1927, prepared for the company in the usual periodical auditing of its books. Similar statements for several preceding years were also asked and furnished. These statements were fully examined and disgested by Lea and Caldwell in negotiations covering a number of days. They each indicated in detail every kind both of assets and liabilities. Among the liability items were shown 12 reserve accounts, but no reserve for annual subscriptions paid for, but not yet fulfilled. This omission was noted and mentioned between the parties, but the Howells stated that they regarded paid subscriptions, though unfulfilled, as an asset rather than a liability, as they increased the good will of the paper and the value of advertising space, but that they thought of attempting a deduction therefor suggested by another publisher, for its effect on income taxation. No discontent was expressed by Lea and Caldwell at the absence of this reserve, and no issue was made that the bookkeeping exhibited to them was improper or erroneous in this respect. In a later interview an agreement was reached and a contract dictated by Mr. Lea, with the statements of 1926 and three months of 1927 before him, which, after some amendments, was signed by all parties about May 27, 1927. The contract is a series of options. The purchase price tentatively fixed for the stock was $1,050,000. The general option, exercisable July 1st, was exercised, and $31,500 earnest money deposited in the bank by Lea and Caldwell, and the stock was indorsed and put in escrow in the bank by the Howells.

Pursuant to the agreement, auditors selected and paid by Lea and Caldwell took the books of the company for examination, refusing assistance or explanations from the Howells, or to give them information of the results, except as directed by Lea and Caldwell. Their report was made known by September 1st, and $100,000 more of the purchase price was deposited, as fixed by the amended contract. The agreement contained, on behalf of the Howells, representations touching certain elements of value in the stock, with a further option to Lea and Caldwell to abandon the purchase if any of these were untrue in excess of 3 per cent., and if those touching the value of the physical assets or touching the profits for the three months of 1927 were, as fixed by the audit, untrue, instead of abandoning the contract, Lea and Caldwell might pursue it at a price to be reduced in agreed ratios. The pertinent words of the contract will be quoted and discussed later. Touching these representations, the audit showed (a) no difference as to outstanding stock; (b) no difference as to circulation; (c) net earnings for 1926 about $12,000 in excess of the representation; (d) net earnings for three months of 1927 only $5,529.14, instead of $107,028.18, as represented, or $1.01 per share, instead of $20; (e) assets, exclusive of real estate, notes and accounts, and good will, of $568,200, instead of the $300,000 represented.

Thereupon, having given due notice of their election to pursue the purchase, within the time limit of the agreement, on October 15, 1927, Lea and Caldwell, contending that the price of $1,050,000 was to be reduced because of the finding of the audit as to subsection (d) above in the ratio of $20 to $1.01, tendered the bank from their deposit of

$131,500 the sum of $54,350.88 (including interest) and demanded the stock and the remainder of the deposit. The difference as to the earnings of 1927 made by the audit is due to the setting up of a reserve liability of more than $100,000 for unfilled annual subscriptions. Whether the auditors were authorized to do this or not, under the contract, construed in the light of the circumstances, is the controlling question.

The words of the contract directly pertinent are:

"Immediately upon the making of the deposit provided for in the paragraph just preceding, the parties of the first part [the Howells] will have all the books, records, and property of the Constitution Publishing Company open for inspection and examination by auditors and appraisers selected and to be paid by the parties of the second part [Lea and Caldwell], said auditors to be, Price, Waterhouse & Co., and said appraisers to be the American Appraisal Company. * * * Likewise, if the said audit fails to substantiate any of the representations contained in the recital of representations above set forth by more than 3 per cent., then the parties of the second part may be released from any further obligation to complete the trade, or may have same completed as hereinafter set forth, and shall state such election in said notice: Provided, however, if such variation in the net earnings for the three months ending March 31, 1927, arrived at as set forth in subsection (d) of the recital of representations hereinabove set forth (except that the payment or accrual of all bond interest for said quarter shall also be deducted), and such earnings as determined by said audit be less than $20 per share for the common stock, then the parties of the second part will have the election of either being released from any further obligation to complete the trade or may have same completed by paying for the aforesaid stock the same proportion of the aforesaid price, either as originally stated or as reduced because the total of the appraisal is less than $300,000, that said net earnings per share for the said three-months period are of $20."

The representation in subsection (d) referred to is this:

"(d) That the net earnings of the Constitution Publishing Company for the three-months period ending March 31, 1927, before the payment of interest on bonds and dividends, but after all other proper charges, deductions, and reserves, including bad debts, were $107,028.18."

Lea and Caldwell contend that under these agreements Price, Waterhouse & Co. were authorized to set up the reserve for unfulfilled prepaid annual subscriptions, if they thought it proper. The Howells contend that under all the circumstances it is to be held that the auditors were given no authority to set up an additional reserve account, but only to verify the representations by ascertaining the profit in the way in which it had always been arrived at by the Constitution Publishing Company, on which basis the representation was known to have been made.

[1-3] It is urged that there are no express words making the audit conclusive, nevertheless I think it evident that a conclusive audit was intended by the parties. There is a direct agreement that, if "such earnings *as determined by said audit* be less than $20 per share," certain things shall follow. It was intended that the audit should be the end, rather than the beginning, of dispute about the net earnings. But it was not any audit, made in any way, that was to be thus conclusive, for the net earnings, by equally plain words, must (with a stated exception) be "arrived at as set forth in subsection (d) of the recital of representations." What method, then, of arriving at net earnings is set forth in that subsection? Subsection (d) does not directly prescribe rules to be followed by the auditor, but merely states that the net earnings were $107,028.18 before payment of interest on bonds and dividends, and after all other proper charges, deductions, and reserves had been made. It is only by indirection that it indicates any rules of auditing. The fair meaning is that the auditors are to arrive at the net earnings as they were arrived at in subsection (d).

The assertion is that all proper charges, deductions, and reserves had been made, and the implication is that the auditors are to do likewise. But are the deductions to be "proper" in amount or "proper" also as to their nature? Do the parties intend that the auditors are to make the same sort of charges, deductions, and reserves, simply auditing their accuracy, which had been *established as proper* by their having been used previously, or are they to use some other standard of propriety? If not the standard of the former practice of the Constitution Publishing Company, is it to be the practice of other newspapers, or the mere judgment of the auditors? The uncertainty inherent in the word "proper" is equal to that in the words "sound literature and solid science," dealt with in Lowrey v. Hawaii, 206 U. S. 206, 27 S. Ct.

622, 51 L. Ed. 1026. Because of the ambiguity, recourse is proper to the negotiations of the parties and to all the surrounding circumstances to ascertain their real meaning. United States v. Bethlehem Steel Co., 205 U. S. 105, 27 S. Ct. 450, 51 L. Ed. 731; Code Ga. 1910, § 4286(1).

With these aids it appears that the figures of subsection (d) were dictated by Mr. Lea from the statement of the Constitution Publishing Company furnished him, and that statement was really what the Howells were representing to be correct. It showed on its face just what sort of deductions and reserves had been made in reaching the net profits, and particular attention had been called to the fact that unfulfilled subscriptions were not considered by the Howells to be a liability, for which a reserve was proper. No contention had arisen about this question to be left to auditors to settle, but there was apparent acquiescence in the view of the Howells. While it is true that, if a newspaper should fail before fulfilling its subscriptions, it would owe its paid subscribers a refund, yet a newspaper has its peculiarities, and as a going concern much is to be said in favor of the Howells' contention. It is well known that the cost of printing and distributing additional papers is negligible. To double the circulation would not begin to double the cost of running the business; also the good will and advertising value of the paper are thereby at once greatly increased. This is why publishers will, in premiums and contests, spend the major part of new subscriptions in order to obtain them. The reserve set up by the auditors evidently represented largely new subscriptions, or the results would not have been greatly different from the bookkeeping pursued by the Constitution Publishing Company. The contract was not, by its terms, to be concluded until October, when the greater portion of the mass of unfulfilled subscriptions found by the auditors would have been fulfilled, the profits inherent therein realized, and the reserve set up against them thus largely canceled.

These facts alone seem to me to require a finding that the parties did not intend to authorize the auditors to set up such a reserve in the event the auditors thought it proper. Both the Howells and Lea and Caldwell were experienced newspaper men and able to judge for themselves of such a matter in their line of business, and to appreciate the result of a failure to carry such a reserve. Especially is it unlikely that the Howells would have agreed to such a power in the auditor. The contract was at best one-sided against them in many features. If their representations should prove materially untrue, the opposite party could withdraw, or reduce the price and go on; but, if the values were found greater than represented, the Howells get no benefit therefrom. If the value should be greater in all other particulars (as they were found to be), but less in the one point of recent earnings, all the gains go for naught, and the one failure is to control the price. The power in the auditors to fix these earnings is thus the power to fix the price. It is hardly believable that this power would have been given to auditors chosen and paid by the other parties, unless it was understood that the audit was to be no more than a verification of the statements from the company's books and an appraisal of its property. "The party who wrote the contract and was the author of the ambiguity has the burden of explaining it, when he seeks to take the benefit of a construction favorable to himself; and, if he does not clear up the meaning beyond doubt, the doubt must be given against him." Hill v. King Mfg. Co., 79 Ga. 106, 3 S. E. 445.

The results that actually flow from the construction claimed by Lea and Caldwell, all of which could have been easily foreseen, emphasize its unreasonableness. On the basis of the facts represented by the Howells, Lea and Caldwell were willing to pay $1,050,000 for the stock, and did put in the bank $131,500 thereof. The audit finds these facts were all basically true, except that the physical property was worth much more than was claimed, but on a debatable interpretation of the status of the paid subscriptions, whose existence was really the greatest element of value in the paper, that the price should be reduced by $1,000,000. When it is remembered that these very subscriptions were to be, in the main, fulfilled at little additional cost before the property was to be delivered, the result is little short of shocking. It is stated in the answer that this price does not cover the cost of a printing press recently installed. By an amendment to the petition, Lea and Caldwell propose to have the judge fix a fair price for the stock. This amendment, while without legal significance, seems to indicate a consciousness that things are not wholly right. I am impressed that, were the true construction of the contract such as plaintiffs contend for, there would be such an equitable accident involved as is defined by Code Ga. § 4565 thus: "An accident re-

lievable in equity is such an occurrence, not the result of negligence or misconduct of the party seeking relief in relation to a contract, as was not anticipated by the parties when the same was entered into, and which gives an undue advantage to one of them over another in a court of law." Surely neither party, if they understood that the auditors were to pass on the propriety of reserves, as respects their nature, as well as their amount, anticipated that the auditors would so deal with a reserve, about whose propriety there had been no question between the parties, as to practically take from one and give to the other $1,000,000.

For these reasons, I think the answer sets up a good defense at law, and, if not, with slight formal amendment would set up a good defense in equity.