Booth, Chief Jus tide,
delivered the opinion of the court:
The plaintiff sues to recover a judgment for $182,672.17. The defendant interposes three counterclaims. The case is the result of contracts to purchase two steel vessels entered into by the plaintiff with the Shipping Board. The plaintiff and the board on March 5, 1920, executed what is known as an agency agreement for managing and operating steel cargo vessels. This instrument was a general agency agreement and did not specify particular vessels to be delivered to the plaintiff under it. In May, 1920, the plaintiff inaugurated negotiations for the purchase of two steel cargo vessels, viz, the Westmount and the Cascade. The boar'd was willing to sell the vessels, but the terms of the sale could not be then definitely fixed, the board having at the time under consideration its general sales policy in accord with the merchant marine act of 1920. The parties, in view of this situation, entered into the contract of May 29, 1920. This contract provided for the coming into existence of two relationships. The board was to deliver the two vessels to the plaintiff to be managed and operated under the terms'of the general operating contract of March 5, 1920 — -identified as the MG3 contract — and in addition the plaintiff agreed to buy and the board to sell the two vessels under terms and conditions thereafter to be adopted by the board as its standardized sales policy, the plaintiff expressly agreeing to execute and deliver to the board a contract for the purchase of the vessels within 10 days after the receipt of this final contract. It was in accord with this contract for the purchase of the Westmount, and the subsequent contract consummated by written letters for the purchase of the Cascade, that the plaintiff deposited with the board the total sum of $271,902.76 as a guaranty for entering into the final contracts of sale as per the terms of the agreement of May 29, 1920, the contract providing that in the event of the failure of the plaintiff to comply with the same the deposited sums should be retained by the board as liquidated damages, and *25 it is for this sum, less certain credits admittedly due the board, that this suit is brought.
On August 16, 1920, the board announced its standard sales policy for the sale of steel cargo vessels which included, of course, the Westmount and Cascade. Among other provisions the standard sales policy of the board required the appraisal and advertisement for sale of vessels coming within its terms. Bids were to be received and the sales finally consummated upon the express terms therein stated. As an assured security for deferred payments the purchasers were to deposit all revenue derived from the operation of the vessels in an account under the control and supervision of the board, until the deferred payments had been met to the extent of 50% of the purchase price. After this time, with certain other privileges granted the purchaser not important herein, the purchaser was to execute a preferred mortgage for the remaining sums due, and revenues from operation were to be released from the controlled account.
On September 9, 1920, the plaintiff submitted its bids for the two vessels involved, viz, $1,303,500 for the Cascade and $1,416,283 for the Westmount. In the letter submitting plaintiff’s bid for the Westmoimt attention was directed to a surplus due the plaintiff from the sums deposited under the May 29, 1920, contract arising from the difference between the purchase price tentatively agreed upon in that contract and the purchase price fixed by the standard sales policy of the board. The board, in order to return the surplus and relieve the plaintiff from the provisions of the controlled account of revenues derived from operations which were seriously embarrassing the plaintiff financially, as noted in plaintiff’s letter of August 24, 1920, agreed to release the controlled account, upon the /express condition that the plaintiff would organize two separate corporations for the operation of the two vessels and have the notes for their purchase price indorsed by the plaintiff. This was finally accomplished as the board directed. Two separate corporations, one the Westmount Steamship Company and the other the Cascade Steamship Company, were organized and incorporated.
*26 On November 28, 1920, the board forwarded to the plaintiff purchase agreements in duplicate, accompanied by mortgages and two series of promissory notes covering the purchase price of the two vessels. The plaintiff ■ received, but never did sign, the agreements or execute the securities. On the contrary, December 13, 1920, the plaintiff asked to be relieved from the contract of May 29, 1920, offering at the same time to redeliver the vessels to the board free from all operating debts, the accounts to be audited and the board to have any and all profits earned by the vessels, and the plaintiff to stand all losses, if any, incurred in their operation. Considerable correspondence followed. The board adopted resolutions on January 25, T921, authorizing the audit of plaintiff’s accounts, and the return of the vessels.
The vessels were delivered to the board, and during the course of the proceedings the board did offer the plaintiff a right to rescind the contract of sale upon the condition that the net profits from the operation of the vessels under the terms of the M03 agreement were not less than the sums deposited and forfeitable under the May 29,1920, agreement. This offer the plaintiff expressly declined. Thereafter the plaintiff preferred its claim to the board for the return to it of the deposited sums. Finally, following the opinion of the general counsel of the board, the plaintiff’s claim for a return of the deposit was denied and the same retained, the board being of the opinion that it was not lawfully authorized to relinquish a legal right without consideration.
The agreement of May 29, 1920, was an executory contract for the sale of the two vessels involved. Possession but not title, passed to the plaintiff under it. The plain terms of the agreement clearly indicate the intention of the parties. The plaintiff was to have possession of the vessels under the agency and operating agreement of March 5,1920, at the same time obligating itself to purchase the vessels when future conditions rendered it possible to sell the same. The binding obligations of this agreement are apparent, and the plaintiff complied with its part of the undertaking in every respect. The plaintiff now says that it must be relieved from the agreement because the defendant did not in all respects observe the terms of the same, in so far as it agreed to sell *27 said vessels upon the terms and conditions of its standard sales policy and instead offered terms of sale radically different therefrom.
Manifestly this contention, in the light of the findings, is one not insisted upon by the plaintiff in its correspondence in reference to the issue. The plaintiff’s interest in the purchase of the vessels originated in its purpose to transport large cargoes of munitions of war to Russia. Contracts for transportation between the Russian Volunteer Fleet and the plaintiff so to do existed, and there was nothing then in the way of accomplishing them. In fact, one large cargo -was aboard one of the vessels when governmental permission to so transport was withdrawn. As a result of this interdiction and acute competition as to freight rates between the United States and foreign countries, the plaintiff found itself unable to finance the undertaking and frankly so stated. It is now contended that the plaintiff is entitled to a recovery because the board did not accept its offer in accord with the precise terms of its standard sales policy, and hence no valid contract of sale came into existence. It is true the board did not strictly observe the terms of its standard sales policy. That it accepted the offer and amount of the bid is evidenced by the tender to the plaintiff of the mortgages and notes to carry the same to completion; acceptance did not exact a more formal act. If one submits a bid and the other party tenders papers sufficient to cover the transaction, the act of the latter clearly evidences acceptance. The primary difficulty with the plaintiff’s contention is that the terms of the sale of the vessels were modified at the plaintiff’s suggestion. The controlled account, which tied up the revenues received from the operation of the boats, a stipulation creating the same being found in both the M03 agreement and the standard sales policy of the board, had been rescinded by mutual agreement, and the plaintiff in consideration thereof had incorporated the operation of the vessels as it agreed to do.
The effect of the waiving by the board of this method of security for the payment of deferred installments of the purchase price of the vessels essentially changed the char *28 acter of the terms of sale, and the provision of the standard sales policy providing for the execution of a preferred mortgage upon the vessels, which was dependent upon the controlled account, became ineffective and would have left the board with no greater security for the vessels than the promissory notes executed by the corporations and endorsed by the plaintiff. In other words, the terms of the standard sales policy simply provided that when installment payments made under the controlled account equalled 50% of the purchase price, the controlled account would be released and a preferred mortgage on the vessels taken by the board to secure the remaining 50%. The modification of the controlled account carried with it the 50% mortgage provision and essentially changed the transaction. The plaintiff interposed no objection whatever to the modified terms of sale, or the change made at its request in the standard sales policy of the board. Again, the plaintiff insists that under the standard sales policy the plaintiff was to execute and deliver to the board a contract for the purchase of the vessels containing the terms of the standard sales policy within 10 days after receipt of such a contract from the board, and that this was not done.
What does the record disclose in this respect? September 9, 1920, the plaintiff submitted its bids. In the letter submitting the bid for the Westmount, attention was called to an overpayment of deposits, which the plaintiff asked to be refunded. This is not all. The plaintiff previous to this time, i. e., on August 24, 1920, had in a letter referred to in Finding VIII expressly notified the board that if the controlled account provision of the standard sales policy was to obtain, the plaintiff on account of financial conditions would not wish to carry through the transaction at all. So that on the date of the submission of its bids there was then pending before the board, at the plaintiff’s insistence, the issue of the modification of the standard sales policy of the board with respect to the release of the controlled account, and the question was not finally adjusted until October 18, 1920 (Finding IX), when the plaintiff expressly signified its willingness to sign the notes as the modified agreement contemplated. Thereafter the transaction proceeded in accord with *29 the modified agreement. Therefore, in so far as the 10-day provision is involved, the delay was due exclusively to the plaintiff, for its especial benefit, and an agreement evolved in accord with plaintiff’s wishes. What the board agreed to do in the first instance was to submit to the plaintiff a contract of sale in accord with its standard sales policy, and the plaintiff was to execute and deliver the same to the board within 10 days from its receipt. The performance of this stipulation was rendered impossible by the plaintiff, not the board.
In United States v. Bethlehem Steel Co., 205 U. S. 105, 119, the Supreme Court said:
“ The courts at one time seemed to be quite strong in their views and would scarcely admit that there ever was a valid contract providing for liquidated damages. Their tendency was to construe the language as a penalty, so that nothing but the actual damages sustained by the party aggrieved could be recovered. Subsequently the courts became more tolerant of such provisions, and have now become strongly inclined to allow parties to make their own contracts, and to carry out their intentions, even when it would result in the recovery of an amount stated as liquidated damages, upon proof of the violation of the contract, and without proof of the damages actually sustained. This whole subject is reviewed in Sun Printing & Publishing Association v. Moore, 188 U. S. 642, 669, where a large number of authorities upon this subject are referred to. The principle decided in that case is much like the contention of the Government herein. The question always is, what did the parties intend by the language used? When such intention is ascertained if is ordinarily the duty of the court to carry it out. See also Clement v. Cash, 21 N. Y. 253, 257; Little v. Banks, 85 N. Y. 258, 266.”

Defendant's counterclaims

The first counterclaim rested upon a difference between the contract price for which the vessels were sold and the market value of the same on the date of the refusal to purchase, and may, we think, be disposed of upon the facts. This counterclaim involves a large amount, to wit, $1,575,-425.47. The Westmount was delivered to the board on February 12, 1921, and the Gascade on March 21, 1921. Subse *30 quent to the delivery of the vessels the board made no serious attempt to dispose of them; on the contrary, the board retained them and valued the same at $185.00 per deadweight ton. This valuation was in excess of the plaintiff’s purchase price. The vessels were not offered for sale at any available market price until subsequent to January, 1922, at a time when practically no market existed for them. If the valuation fixed by the board at the time of the breach indicates market value, the board’s loss was insignificant, and assuredly no legal right obtained to retain the vessels until their worth dwindled to such an extent as to be almost worthless, and then charge the plaintiff with the loss suffered. From the record it is apparent that the board was content to accept a redelivery of the vessels, relying upon the forfeiture of deposits made to cover the loss. In addition to this, the dual character of the agreement of May 29, 1920, was construed by the board as entitling the plaintiff to an accounting for the operation of the vessels under the agency agreement of March 5, 1920. This is manifest from the attitude of the board with respect thereto. No demand was made by the board upon the plaintiff for any amount except the sums due under the agency agreement of March 5, 1920, and no claim of any character was ever preferred against the plaintiff for a loss due to the difference in market value of the vessels, until this counterclaim was filed.
The single demand of the board is evidenced by the letter of its chairman of November 1, 1924 (Finding XVII). This letter is predicated upon an audit of the plaintiff’s accounts under the M03, or agency agreement, and not upon any other alleged loss. It is conceded by a stipulation of the parties (Finding XVIII) that errors in the original computation reduced the sums claimed in the letter to $85,-100.17, and for this amount the defendant is entitled to a judgment.
The second counterclaim concerns income taxes. The plaintiff on June 16, 1919, filed its income-tax return for the period from June 1, 1918, to December 31, 1918. On October 16, 1923, the Commissioner of Internal Revenue assessed additional taxes in the sum of $5,873.22 for this period.
*31 On March 15,1920, plaintiff filed its income-tax return for the year 1919, and the commissioner thereafter, on June 25, 1925, made an additional assessment of $1,278.56. The plaintiff has not paid the additional assessments and no suit or proceedings of any character was ever instituted by the commissioner to collect the same until this counterclaim was filed April 14, 1928. The plaintiff pleads the statute of limitations, relying upon sec. 250 (d) of the revenue act of 1918 (40 Stat. 1057, 1083) and the same section of the act of 1921 (42 Stat. 227, 265). We think the plea is well taken. Russell v. United States, 278 U. S. 181, and Bowers v. New York & Albany Lighterage Co., 273 U. S. 346. The last additional assessment was made more than five years after the return was filed.
The third counterclaim is troublesome. On November 20, 1919, the board submitted for sale by advertisement two Kirby sailing vessels of specific tonnage. In addition to the sailing vessels certain steamship hulls described as in various stages of completion were to be disposed of, and the sailing vessels themselves were in course of completion moored at Beaumont, Texas. The plaintiff submitted its bid for the sailing vessels offering in its first bid $21.40 per ton therefor, and accompanying the bid with a certified check for $50,000. Subsequently this bid was withdrawn and another substituted, changing its bid to the flat figure of $42,-800.00 for each of the vessels. The substituted bid was accepted by the board and by its terms the plaintiff obligated itself for not only the stated purchase price, but agreed in addition to pay for all fittings, “ whether on the hulls, in the yards or elsewhere at the inventory appraised price,” ancL the cost of installing the same on the hulls. When the time arrived for a settlement as to the cost and expense of installing all fittings a controversy developed as to what items in the inventory of so-called fittings should or should not be classified as such. The difference in the sums claimed is most substantial, the board now insisting in this counterclaim that fittings include all that was added to the vessel subsequent to its sale, amounting to $51,758.41; the plaintiff on the other hand conceding liability to the extent only of $4,130.42. Expert testimony was adduced, and obviously the *32 subject matter is one determinable from evidence of that character. The advertisement offering all the vessels for sale is confusing. It is difficult to ascertain whether the board was soliciting bids for sailing vessels, that is incomplete sailing vessels, except as to fittings, or whether it was intending to designate this class of vessels as hulls. It would, as plaintiff suggests, have been more in accord with established practice to have said to prospective bidders the vessels are offered “ as is ” and “ where is ” if the intention was to sell them in their then condition. What the plaintiff evidently intended, as its express offer clearly indicates, was to purchase the vessels on a bare-boat basis, assuming liability for the necessary fittings and cost of installation. In accepting the final bid of the plaintiff the board gave a written notice to the plaintiff that the vessels were sold on a bare-boat basis, the purchaser to pay “ for any and all fittings that go with these vessels.” No doubt the plaintiff would have considered its offer of purchase in a much different light if it had anticipated an additional expense over and above its bid of over fifty thousand dollars, and there is manifestly room for entertaining an intent on the part of the board to sell all accumulated materials on hand, as well as the incomplete hulls. Under these circumstances it seems to us that in a ship transaction between parties dealing in that class of commodities, familiar with technical terms used in the trade, and the extent and meaning of the same, the terms so used should be restricted to their technical meaning. The board proposed them, formulated the advertisement, and the plaintiff, it seems, had a right to rely upon their accepted meaning. To sell a sailing vessel on a bare-boat basis is uniformly understood in the shipping world to contemplate a vessel ready for sailing except as to crew and the incidentals appurtenant to and necessary for the maintenance of the crew. To sell a hull and the necessary fittings to complete the vessel can not by any possibility, in view of this record, be made to comprehend the numerous items for which the court is now asked to charge against the plaintiff as fittings. This term, according expert testimony its worth, may not be extended to include items other than those essential to bring the hull of the vessels to a bare-boat status. This view of the situation *33 we think is sustained by the board’s action with respect thereto, for notwithstanding the lapse of seven years no bill was ever rendered to the plaintiff or its surety for this claim until after this suit was commenced. The defendant is entitled to a judgment upon this item, $4,130.42.
The defendant in an amended counterclaim charges the plaintiff with improperly and mistakenly deducting $11,-908.68 from balances due the board under the final settlement made as to the M03 contract. The plaintiff contends that this amount is included in the balance admitted to be due, i. e., the $85,100.17 item. We think the plaintiff’s contention is sustained by the record. Finding XVTIX depicts the situation.
Judgment for the United States in the sum of $89,230.59. It is so ordered.
Williams, Judge; Littleton, Judge; Green, Judge; and Graham, Judge, concur.