## SARNIA STEAMSHIPS, LIMITED, v. CONTINENTAL GRAIN CO.

### No. 7618.

Circuit Court of Appeals, Seventh Circuit.

Nov. 18, 1941.

Rehearing Denied Feb. 21, 1942.

R. Z. Hickman and Frederick Mayer, both of Chicago, Ill., (Poppenhusen, Johnston, Thompson & Raymond, of Chicago, Ill., of counsel), for appellant.

Robert Branand, Jr., of Chicago, Ill., for appellee.

Before SPARKS, KERNER, and MINTON, Circuit Judges.

SPARKS, Circuit Judge.

Libelant brought this action in admiralty to recover demurrage arising out of respondent's delay in unloading 400,000 bushels of corn from libelant's boats at Montreal, Canada. Libelant's written proposal for the transportation of the corn was accepted in writing by the respondent. This proposal was made for libelant by the Fitzgerald Company, on October 9, 1939, and it was accepted for respondent by S. Mayer.[1]

The respondent admitted the material facts alleged in the libel, but contended that under the terms of the contract the sum of only $2,896.87 was due from it, which it had previously tendered. The freight was fully paid and is not here involved. On February 4, 1941, the court found for libelant in the sum of $14,630.79, which includes $824.54 interest at five per cent per annum from November 15, 1939.

The grain was loaded in accordance with the terms of the contract in the "Geistman" and "Ethel" at Chicago on October 17 and 18, 1939, and carried by these vessels to Port Colborne, Ontario, where it was transshipped into five canal-size steamers, the "Fairriver"; "Ralph Gilchrist"; "C. H. Houson"; "J. O. McKellar"; and "Drumahoe." These carried the grain from Port Colborne to Montreal. The last-named vessel carried a total 70,605 bushels of grain from Port Colborne to Montreal, of which only 10,284 bushels of corn belonged to respondent. The balance of 60,321 bushels of wheat belonged to a third party, and respondent had no interest in it. At the trial libelant waived all claim for demurrage with respect to the "Drumahoe," in order to avoid the complication of calculating the liability with respect to this boat as between the respondent and the owner of the wheat.

The following table shows the time of arrival at Montreal and the time of unloading of the other four canal steamers:

| | Arrived 1939 | | Unloaded 1939 | |
|---|---|---|---|---|
| Fairriver | Oct. 26—3:45 P. M. | | Nov. 10— 3:45 P. M. | |
| Ralph Gilchrist | " 27—2 | P. M. | " "—11 | A. M. |
| C. H. Houson | " 28—2:45 A. M. | | " "— 6:30 P. M. | |
| J. O. McKellar | " 29—7 | A. M. | " 13— 6:45 P. M. | |

The principal question raised here is whether the court erred in holding that the contract provided that respondent should pay demurrage at the rate of $12.50 per hour for each of the four canal vessels delayed, or alternately, in not holding that the demurrage charge of $12.50 per hour applied to the entire cargo of grain, and not

---

[1] "October 9, 1939.
Continental Grain Company,
332 South LaSalle Street
Chicago, Illinois
Att: Mr. Simon Mayer
Gentlemen:
        Charter Confirmation
This confirms our charter with you today for the account of Sarnia Steamships, Ltd. of the Canadian steamer John P. Geistman to load around two hundred ten thousand (210,000) bushels of corn and the barge Ethel to load around one hundred ninety thousand (190,000) bushels of corn on or about Monday, October 16th at South Chicago for Montreal, Quebec, Canada, the freight rate to be six and one quarter cents (6¼¢) per bushel * * * on the cargo loaded by the steamer Geistman and six cents (6¢) per bushel * * * on the cargo loaded by the barge Ethel. It is also understood that the barge Ethel will be towed by the S/S Geistman and that these cargoes will be transshipped at Port Colborne, Ontario or Prescott, Ontario, whichever is more convenient for the owners.

It is further agreed that space for this cargo is to be guaranteed in the destination elevator in order to assure prompt unloading or that you will name the ocean space that will handle this grain on or before the arrival of the grain at Montreal and that in any event, in case of a delay in the unloading at Montreal, demurrage in the amount of $12.50 per hour will be payable seventy-two hours after the arrival of the grain at that port.

Under present schedule. these two vessels should be available for loading on Monday, October 16th. The Geistman has four compartments and should load around 210,000 bushels of corn and the barge Ethel has three compartments and should load around 190,000 bushels of corn.

We thank you for the opportunity of allowing us to complete this charter and trust that the operation will work out to your complete satisfaction.
        Yours very truly,
        Fitzgerald Company
            W. W. Fitzgerald (signed)
Accepted by:
    (S. Mayer).

364

to each of the vessels separately. No question is raised as to the calculations of either party, but they differ in their interpretation of the language of the contract which is the basis of both calculations. Each asserts that the language relied on is unambiguous, notwithstanding the fact they reach different conclusions. This is not at all unnatural because both jointly are giving a double meaning to the language of the contract. Each, in good faith, not only thinks it is unquestionably right, but it is convinced that its opponent is just as clearly wrong. So, regardless of the parties' assertions in this respect, the court is confronted with a typical case of interpreting the ambiguous language of the contract.

■ It has long been the rule in such cases for the court to receive all material evidence that would reasonably tend to enlighten it as to the conditions, surroundings and purposes of the parties at the time they entered into the contract. This is permitted, not for the purpose of adding to or eliminating any of the language of the contract, or in any manner varying its terms, or changing any clear and well-defined meaning of its words, but for the purpose of placing the court in as near the same position as the parties were when the contract was entered into, in order that it may be the better enabled to determine the reasonable meaning of the language as used and intended by the parties.

■ With this principle in mind the District Court permitted libelant to introduce evidence of the size, capacity, value, size of crew, earning capacity per day and cost of operation per day of each canaler, taken over a five-year period based on a 229 day operating season. To the questions eliciting this information the respondent duly objected and preserved its exceptions. It now relies upon those exceptions for reversal. We think the rulings were correct. See United States v. Bethlehem Steel Company, 205 U.S. 105, 27 S.Ct. 450, 51 L.Ed. 731; Brawley v. United States, 96 U.S. 168, 24 L.Ed. 622; Vandevort v. Thompson-Starrett Co., C.C., 182 F. 875.

The remaining problem is to determine what the parties meant by the language used in the proposal. That is to say,—does a fair construction of the accepted proposal, under all the circumstances, mean that the respondent should pay demurrage on each of the canalers or upon only the one which delivered the last of the wheat.

■ Honesty of both parties, of course, is presumed, and it is clear that each desired that the wheat should be unloaded at Montreal as soon as possible after its arrival. Respondent guaranteed that there would be available elevator space at Montreal for that purpose, and both parties agreed that demurrage would not begin until seventy-two hours after the arrival of the grain at that port. In other words, three days were agreed upon as a reasonable time in which to unload. The very apparent reason for this limitation was that libelant desired to protect itself against the loss of the use of its boats after the expiration of the agreed unloading period. Respondent must be charged with knowledge of this fact, for it agreed to pay the agreed price for that purpose, which was a shade less than the undisputed actual cost of operating each canaler. It is not unreasonable to assume as a matter of good faith that respondent intended, by the language of the contract, to hold libelant harmless for the loss of the use of its boats after the agreed unloading period, and we think the language of the contract carries out that intention. To hold otherwise would be to inflict admitted damages upon libelant for which it was in no manner the cause, either by tort or contract, unless it can be said that it failed to contract against the loss. We can not accept the latter conclusion.

Respondent contends that the entire amount of corn was treated by the parties as one cargo and should be so treated in applying the demurrage agreement. However, the contract treats each boatload as a cargo, and respondent knew and agreed that the two cargoes leaving Chicago might be transshipped at Port Colborne, Ontario, and they were. This was done because the "Geistman" and "Ethel," on account of their size, could not ply the canal. The boats plying the canal were smaller and it was apparent that more boats would be necessary to carry all of the corn from Port Colborne to Montreal than from Chicago to Port Colborne. Respondent must have known this, and no limitation was placed on the number of boats. There was no overreaching here, for libelant transshipped the corn on five of its larger canal boats. Four were entirely filled with respondent's corn, and 10,000 bushels went with a mixed cargo upon the "Drumahoe"—no claim being made as to the latter for reasons hereinbefore stated.

Respondent further contends that libelant's construction of the contract might be

productive of gross fraud, in that the latter might have employed an excessive number of boats to make the transshipment. That situation is not presented here. If it ever should be we have no doubt of available means at hand to protect the shipper.

Decree affirmed.