496

PACIFIC DOCK & TERMINAL CO. v. LOS ANGELES DOCK & TERMINAL CO. et al.

No. M–46–H.

District Court, S. D. California, S. D.
July 8, 1930.

Farrand & Slosson, all of Los Angeles, Cal., and Gregory, Hunt & Melvin, of San Francisco, Cal., for plaintiff.

Walter M. Campbell, Anderson & Anderson, and Anderson, Anderson & Sheahan, all of Los Angeles, Cal., for defendant Los Angeles Dock & Terminal Co.

O'Melveny, Tuller & Myers, of Los Angeles, Cal., for defendant Pacific Southwest Trust & Savings Bank.

COSGRAVE, District Judge.

On March 30, 1923, D. M. Reynolds, representing the interests that later became incorporated as *Pacific Dock & Terminal Company,* the plaintiff in this action and which will be called the Pacific Company, addressed a letter to one of the defendants Los Angeles Dock & Terminal Company, which will be called the Los Angeles Company, asking for an option to purchase 220 acres of Long Beach water-front property owned by the Los Angeles Company at a price of $2,000,-000.

D. M. Reynolds at all times acted as agent and under authority of the Pacific Company and as its trustee in the execution of the instruments referred to, and no distinction will therefore be made between him and the plaintiff corporation.

He was unable to make a formal offer because the merger of the interests he represented, being certain steel properties, had not yet been perfected. Therefore an option was asked for in order that time might be had for the completion of the merger.

After referring to rivalry between Northern and Southern California for the location of the enterprise, the communication states: "The southern California interests have, of course, endeavored to bring these industries to the south since they realize the tremendous increase in values throughout southern California and particularly in the harbor district that would result from the location of steel mills here. It is evident that the location of such mills in the harbor district should absolutely insure the industrial future of southern California and should send property values in the Long Beach area skyward."

The Los Angeles Company accordingly gave to Mr. Reynolds the option asked for. Among other things, it contained this provision:

"It is understood and agreed that one of the principal considerations moving from the party of the second part to the party of the first part for this option is the representation on the part of the party of the second part that if this option be exercised it will be exercised by a Steel Company made up by consolidation or otherwise of a number of steel, iron, and coal companies and properties, and that a steel plant will be located on said real property to the advantage of other properties owned by party of the first part in the vicinity thereof, and it is hereby covenanted that this option shall not be transferred or assigned to any person or corporation other than such steel company without the consent

in writing of the party of the first part had and obtained."

The option was kept alive by certain payments as therein provided until November 8, 1923, at which time an entirely new agreement was made expressly canceling all previous agreements and fixing the rights of the respective parties to the land involved in the option as in that agreement set forth and not otherwise. This agreement, dated November 8, 1923, while written in the form of an option, required for its exercise on the part of plaintiff payment on that day of an initial sum of $100,000 of the purchase price. By it, the first party, the Los Angeles Company, defendant herein, gave to Reynolds as trustee "the option to purchase the real property hereinafter described, by payment of two million ($2,000,000) dollars to the party of the first part as follows: One hundred thousand ($100,000) dollars on or before the 8th day of November, 1923, * * * and the further consideration mentioned and secured by the trust agreement this day entered into by the parties hereto."

The steel plant originally suggested had, by negotiations between the parties, been changed to a blast furnace for the making of pig iron as a more comprehensive term and more correctly describing the enterprise contemplated by the plaintiff.

Reference to either steel plant, referred to in the agreement of April 9th, or blast furnace was entirely omitted in the body of the agreement of November 8, as was also any reference to any advantage to other property owned by the defendant. It provides, however, for the transfer of a certain one hundred acres of the land described in the agreement to the Pacific Southwest Trust & Savings Bank, as trustee, "under trust agreement to be contemporaneously executed by the parties hereto."

The trust agreement is in the form of a letter signed by the Pacific Dock & Terminal Company, the defendant corporation, addressed to the Pacific Southwest Trust & Savings Bank. It recites the conveyance of the title to one hundred acres of the tract, saying: "This title you shall hold in trust until July 8, 1927, * * * at which time you shall sell the same, or so much thereof as may be necessary, to realize the amount of five hundred thousand ($500,000) dollars, and shall pay five hundred thousand ($500,000) dollars to the Los Angeles Dock & Terminal Company, and shall reconvey the remaining lands, if any, to D. M. Reynolds. * * * In the event that D. M. Reynolds, his succes-

sors or assigns, shall, on or before the 8th day of July, 1927, construct a blast furnace for the making of pig iron at or adjacent to the property herewith delivered and within the city limits of the City of Long Beach, the said real property described in the conveyance shall be thereupon conveyed to the said D. M. Reynolds in its entirety."

By agreement between the parties, the one hundred acres was later reduced to seventy-five acres, and the Pacific Southwest Trust & Savings Bank now holds title to seventy-five acres under the conditions hereinbefore recited.

The Pacific Company did not construct the blast furnace before July 8, 1927, or at any time. On that date it filed its bill in equity in this court, naming as defendants the Los Angeles Company and the Pacific Southwest Trust & Savings Bank, and at the same time obtained a temporary restraining order prohibiting the defendant bank from selling the seventy-five acres under the provisions of the trust agreement. In its bill the plaintiff recites the various steps in its negotiations with the Los Angeles Company, resulting in the agreement of November 8, 1923. The bill charges that the parties did not attempt to agree in advance upon the sum of $500,000 as the amount of actual damage that would be sustained by defendant on failure of plaintiff to construct the blast furnace, and that same was not a part of the purchase price of the property, but that it was a penalty imposed upon plaintiff. That at the time it was neither impractical nor extremely difficult to fix the actual damages that would have been sustained by the Los Angeles Company by the failure to erect the blast furnace. That the sum of $500,000 is a penalty and grossly out of proportion to such damages. That defendant has suffered no actual damage by reason of the plaintiff's default.

The bank, answering, claims that it is a mere stakeholder and abides the result of the suit. The Los Angeles Company by its answer denies the allegations of the bill above recited and affirmatively alleges that the obligation to erect the blast furnace was a part of the consideration for the sale of the land and that the defendant would not have sold the same for $2,000,000 without such additional consideration.

At the opening of the trial the plaintiff claimed that from the admissions of the pleadings it followed as matter of law that the obligation to pay the $500,000 was a penalty and not liquidated damages, and the court therefore had nothing before it except to re-

quire the defendant to prove its damages. The defendant, on the other hand, took the position that it was shown by pleadings with equal certainty that on November 8, 1923, it was not only extremely difficult but actually impossible to fix the actual damage that would result to the defendant in the event of failure on the part of plaintiff to erect the blast furnace and therefore the $500,000 was agreed upon as liquidated damages. That in another view the $500,000 was a part of the consideration for the 220 acres additional to the $2,000,000 and to be recovered as such. That therefore the only possible course open to the court was to deny relief to plaintiff and to allow the bank to sell the property in accordance with the trust agreement.

The court declined to adopt either view thus urged, announcing that the question as to whether it was impossible or extremely difficult to fix the actual damages, and therefore whether the obligation was a penalty or liquidated damages, was a question of fact to be determined by a review of the entire conditions under which the agreement was made so that the exact intention of the parties might be arrived at. No view was expressed at that time as to whether or not the sum mentioned was part of the consideration for the sale of the property. Evidence was thereupon offered on behalf of the respective parties bringing into review the entire negotiations leading up to the execution of the agreement of November 8th, and in some respects subsequent to that date.

There is no question that when the agreement was made plaintiff fully intended to construct the plant. The enterprise was represented to defendant to be one of great magnitude, a combination of various steel manufacturing plants then existing at points along the Pacific Coast. An investment reaching $15,000,000 was forecasted by plaintiff; three hundred cars of coal daily was the estimated consumption of that commodity. While the description of the proposed enterprise was changed from a steel plant as first described, to a blast furnace as described in the final agreement, no lessening of the proportions of the enterprise was suggested so far as I can find. Altogether the situation was such as to lead defendant justly to expect that an industrial enterprise of very considerable magnitude, being the production of a basic material of extensive and wide use, would be located in the Long Beach Harbor district and an enhancement of values was naturally and reasonably expected. The growth of the district was at that time showing a great impetus. Plaintiff's own evidence shows that the property of something more than twenty acres, retained by the defendant, advanced from a value of $272,776 on April 9, 1923, to $329,490 on November 8th of the same year, an increase of 25 per cent. in seven months, and on July 8, 1927, had reached a value of $592,315, an increase of about 120 per cent. This increase was attributed largely to an improvement in harbor facilities brought about by dredging carried on by the city of Long Beach. I mention the figures merely to show that there was an apparent upward trend in property undoubtedly due to the expectation of an increase in business at the port. What additional value might have resulted from the establishment of a basic industry, together with a train of allied industries, which might reasonably be expected to accompany it, at the time this contract was made, was obviously problematical and entirely uncertain.

The plaintiff in the action has introduced evidence to show that the erection of a blast furnace would be an actual detriment to property in the neighborhood. Naturally, defendants' witnesses testified to the contrary. However that may be, it is apparent that such a view was not shared by either the defendant or plaintiff when the contract was made, but upon the contrary, as heretofore suggested, the reverse was urged by the plaintiff and it is not at all impossible that defendants' imagination expanded under the glow of plaintiff's prophecies. The effect of the enterprise as contemplated was at that time of necessity uncertain. Plaintiff, owning steel plants at several different Pacific coast points, intended to transport from its coal mines and quarries, ores and limestone to Long Beach and there erect a blast furnace for the manufacture of pig iron for use in its various plants.

So far as the question of the $500,000 as part of the purchase price of the land is concerned, I can recall no evidence touching that point other than the documents themselves except that the clause of the agreement of November 8th, "for the further consideration mentioned and secured by the trust agreement this day entered into by the parties," was omitted from a proposed draft of contract prepared by the plaintiff, but included at the request of and at the insistence of the defendant. Upon this question the documents themselves are clear and unmistakable. The original option established the construction of the steel plant proposed at that time as one of the principal considerations moving from the Pacific Company to the Los Angeles Company. The extensions of this option

were asked and obtained by plaintiff urging as a reason the time required to complete the amalgamation of the steel interests. The final agreement names as the payment of the property $2,000,000 and the consideration mentioned in the trust agreement; that is, the erection of the blast furnace. This to my mind clearly established the construction of the plant as a part of the consideration for the purchase.

However irrelevant it may be, it appears from the evidence, according to plaintiff's witnesses, that the actual value of 220 acres conveyed on November 8th was $2,276,890. While this circumstance in no sense adds to or lessens the effect of the written language quoted, it affords a possible reason for the obvious willingness of the plaintiff to agree to erect the plant as part of the consideration for the purchase of the land.

As might be expected, numerous decisions have been cited and used during the arguments in support of the claim on the part of plaintiff that the obligation calling for the payment of a half million dollars is a penalty, and by the defendant that it is liquidated damages. The decision of the United States Supreme Court is possibly the most authoritative general statement of the law upon the subject. In Wise v. U. S., 249 U. S. 361, 39 S. Ct. 303, 304, 63 L. Ed. 647, the court had before it a decision of the Court of Claims, awarding to the government the sum of $200 a day for the delay of 101 days in the construction of two laboratory buildings for the Department of Agriculture, in the city of Washington; the contract price being $1,-171,000. The contract provided for a payment of $200 per day as liquidated damages which was allowed by the Court of Claims. In affirming the judgment of the Court of Claims, the Supreme Court says:

"The subject of the interpretation of provisions for liquidated damages in contracts, as contradistinguished from such as provide for penalties, was elaborately and comprehensively considered by this court in Sun Printing & Pub. Ass'n v. Moore, 183 U. S. 642, 46 L. Ed. 366, 22 S. Ct. 240, applied in United States v. Bethlehem Steel Co., 205 U. S. 105, 51 L. Ed. 731, 27 S. Ct. 450, and the result of the modern decisions was determined to be that in such cases courts will endeavor, by a construction of the agreement which the parties have made, to ascertain what their intention was when they inserted such a stipulation for payment, of a designated sum or upon a designated basis, for a breach of a covenant of their contract, precisely as they seek for the intention of the parties in other respects. When that intention is clearly ascertainable from the writing, effect will be given to the provision, as freely as to any other, where the damages are uncertain in nature or amount or are difficult of ascertainment or where the amount stipulated for is not so extravagant, or disproportionate to the amount of property loss, as to show that compensation was not the object aimed at or as to imply fraud, mistake, circumvention or oppression. There is no sound reason why persons competent and free to contract may not agree upon this subject as fully as upon any other, or why their agreement, when fairly and understandingly entered into with a view to just compensation for the anticipated loss, should not be enforced.

"There are, no doubt, decided cases which tend to support the contention advanced by appellant, but these decisions were, for the most part, rendered at a time when courts were disposed to look upon such provisions in contracts with disfavor and to construe them strictly, if not astutely, in order that damages, even though termed liquidated, might be treated as penalties, so that only such loss as could be definitely proved could be recovered. The later rule, however, is to look with candor, if not with favor, upon such provisions in contracts when deliberately entered into between parties who have equality of opportunity for understanding and insisting upon their rights, as promoting prompt performance of contracts and because adjusting in advance, and amicably, matters the settlement of which through courts would often involve difficulty, uncertainty, delay and expense."

I have no doubt that there is a general tendency not to interfere with the deliberate agreements made between parties equally situated. A tendency so to interfere doubtless formerly did exist based upon a fear that an unconscionable advantage had been given to one.

Plaintiff in its argument urges that the amount in this case is out of proportion to the interests involved, in that $500,000 damage is entirely out of proportion to any possible increase in value of the 25 acres retained by defendant, and for that reason alone it must be deemed a pure penalty.

I am unable to adopt that view for two reasons.

In the first place, it is not at all certain that such an element is at all involved. It will be noted that in the option of April 9th the erection of the steel plant was regarded

as of advantage to other properties owned by the Los Angeles Company in the vicinity. It does not appear that this would be the exclusive advantage claimed, but nevertheless the fact is mentioned. However, by the agreement of November 8th, all previous contracts were expressly canceled and the rights of the parties in 220 acres established by that contract alone. The remaining 25 acres retained by the defendant were not included in the tract mentioned, and in view of the express cancellation of all preceding contracts, it is quite questionable whether the condition calling for the payment of $500,000 had any relation to the value of the defendants' remaining lands.

In the second place, while the witnesses for plaintiff gave to the lands retained by defendant, as of November 8, 1923, a value ranging from $339,000 to $378,000, the estimate of the witnesses for the defendant range from $653,000 to $933,000. In view of an increase as testified to by the plaintiff of 120 per cent. in value of these lands between April, 1923, and July, 1927, an additional increase of $500,000 by reason of the erection of the plant described might not be at all improbable, and I am of the opinion therefore that the agreement is not to be rejected on the score that it gives to the defendant an unconscionable advantage, or that it is disproportionate to the possible loss.

As suggested, numerous decisions have been cited, and since the subject is one upon which there exists as wide a difference in views as any that can be mentioned, in view of the fact that the provisions of the Civil Code of California, which control in this case, are specific and in my judgment furnish the determination of what shall be the disposition of this case, I think it would not be profitable to review decisions of other jurisdictions where Code provisions may not be similar or may be lacking entirely. I believe that the rule that must govern the court is found in sections 1670 and 1671 of the Civil Code. By the two sections all contracts by which the amount of damage for the breach of an obligation is determined in anticipation of the breach are void except in cases where it would be impractical or extremely difficult to fix the actual damage.

I know of no rule, or standard of measurement, by which the effect of the failure to erect the plant contemplated in the city of Long Beach could on November 8, 1923, have been measured in advance, and as a consequence the injury that the defendant might suffer. It is true that evidence was given by plaintiff during the trial of the case that the erection of the plant would be an injury to the property of the defendant. The contrary opinion naturally was expressed by the witnesses for the defendant. This conclusion would be entirely at variance with the opinion expressed at the time of the contract by plaintiff and evidently acquiesced in by the defendant, and I am of the opinion now that the erection of the contemplated plant might have had an extremely important effect on values in the city of Long Beach.

Neither do I see any escape whatever from the express statement that the agreement to erect the plant was part of the purchase price of the land.

I think, therefore, that the plaintiff had the option either to build the plant or pay $500,000 as part of the consideration agreed to be paid for the 220 acres. As between a penalty and liquidated damages, that it was the nearest possible estimate of the parties at the time of the amount of damage that defendant would suffer by reason of failure to erect the plant. That in any event, the amount was not so disproportionate to the amount of the damage, assuming that this is an element in the case, as of itself to render it a penalty.

Defendant will prepare a decree in accordance with this opinion, and defendant Pacific Southwest Trust & Savings Bank will be bound by its provisions.