**K–CON BUILDING SYSTEMS, INC., Plaintiff,**

**v.**

**The UNITED STATES, Defendant.**

**No. 05–914C.**

United States Court of Federal Claims.

Jan. 24, 2011.

William A. Scott, Charleston, SC, for plaintiff.

David M. Hibey, United States Department of Justice, Washington, DC, for defendant.

**OPINION AND ORDER**

SWEENEY, Judge.

Plaintiff K–Con Building Systems, Inc. has filed three suits in this court concerning its contracts with the United States Coast Guard ("Coast Guard") for the design and construction of prefabricated metal buildings in Elizabeth City, North Carolina, St. Petersburg, Florida, and Port Huron, Michigan. Although the three suits share many similarities, there are meaningful differences that require the court to address each suit separately. In the instant case, which concerns the building in Elizabeth City, plaintiff moves for partial summary judgment on the issue of liquidated damages. For the reasons set forth below, the court denies plaintiff's motion.

## I. BACKGROUND[1]

In April 2001, the United States General Services Administration ("GSA") awarded plaintiff a Federal Supply Schedule contract for Prefabricated Structures and Outdoor Smoking Shelters. Pl.'s App. 1–9. Subsequently, in September 2003, the Coast Guard solicited proposals for the design and construction of a prefabricated building to house a component repair shop at the Coast Guard Support Center in Elizabeth City. *Id.* at 10, 38. Plaintiff responded to the solicitation and, on September 23, 2003, the Coast Guard placed an order under plaintiff's GSA contract for the solicited building. *Id.* The initial value of the order was $513,520 and the initial completion date was June 17, 2004. *Id.* at 10.

### A. The Liquidated Damages Clause

Plaintiff's contract with the Coast Guard contained a standard liquidated damages clause, which provided for liquidated damages of $551 for each day that plaintiff failed to complete the building beyond the contractually set completion date.[2] *Id.* at 26. At

---

1. The court derives the facts in this section from plaintiff's complaint ("Compl."), defendant's counterclaim ("Countercl."), the appendix filed with plaintiff's motion for partial summary judgment ("Pl.'s App."), and the appendix filed with defendant's opposition in response to plaintiff's motion for partial summary judgment ("Def.'s App.").

2. Specifically, the liquidated damages clause provided:

 (a) If the Contractor fails to complete the work within the time specified in the contract, the Contractor shall pay liquidated damages to the Government in the amount of **$551.00** for each calendar day of delay until the work is completed or accepted.

the time the contract was executed, the Coast Guard was bound by subpart 11.5 of the Federal Acquisition Regulation ("FAR"), which described the general parameters for the use of liquidated damages clauses.[3] *See, e.g., id.* at 210, 215, 220, 228–29. However, it was not subject to any regulations specifying precisely how to determine an appropriate liquidated damages rate. *Id.* at 204. Further, the Coast Guard had no settled policies or procedures concerning the determination of liquidated damages rates. *Id.* at 210, 228–29. Rather, the contracting officer, Cathy Broussard, prior to the solicitation of proposals for the project, determined the appropriate rate using a methodology that the Coast Guard had utilized since at least 1997, the year she joined its contracting staff. *Id.* at 145–46, 209–10, 228–29.

First, Ms. Broussard found that because the Coast Guard would "incur additional costs if the contractor" did not complete the work by the contract deadline and because it would be impossible to ascertain "[t]he extent or exact amount of damages" resulting from the contractor's failure to meet the deadline, it was appropriate to include a liquidated damages clause in the contract. *Id.* at 145. She then concluded that the rate of liquidated damages should be based on the "probable actual damages" that the Coast Guard would incur if the contractor breached the contract by failing to complete the work on time. *Id.* (citing FAR 11.502).

As her next step, Ms. Broussard identified the extra costs that the Coast Guard would incur upon such a breach, breaking them down into two categories: "Travel/Per Diem, Inspection & Miscellaneous Costs" and "Administrative Costs for Government Representatives." *Id.* at 145–46. The first category included travel costs for the project manager and a member of the contracting staff, costs for the time of a construction inspector, and miscellaneous costs such as telephone and mail costs. *Id.* at 145. Ms.

Broussard arrived at a total of $8,685 per month for this first category. *Id.*

The second category encompassed costs for the extra time that would be spent on the project by the Coast Guard personnel involved in the contract's administration and performance, as measured by the hourly rates for their services. *Id.* at 146. Ms. Broussard indicated that these costs were "[b]ased on the guidelines listed" in the following Coast Guard instruction: Standard Rates, Commandant Instruction 7310.1G (May 29, 2001) ("COMDTINST 7310.1G"). *Id.* According to its terms, the purpose of the instruction was to establish standard rates for use in computing reimbursable charges, *i.e.*, the cost of services provided to other government agencies and the private sector that were recoverable pursuant to reimbursable agreements. COMDTINST 7310.1G at 1. However, because "[t]he 'direct' portion of the standard rates include[d] both fixed and variable costs," the rates were "not [to be] used to calculate reimbursement of . . . foreseeable costs related to contracting actions . . . ." *Id.* at 2. Among the standard rates described in the instruction were those for personnel services. *Id.* at Enclosure (2).

Using the standard rates for personnel services contained in COMDTINST 7310.1G, Ms. Broussard calculated the annual cost for each Coast Guard employee and then multiplied those costs by a specified percentage that represented the amount of time the employee would spend on the project. Pl.'s App. 146. She estimated that the Construction Division chief, the Contracting Division chief, and the team leader would spend five percent of their time on the project, the project manager would spend thirty-three percent of his time on the project, the contracting officer would spend ten percent of her time on the project, and the contract specialist would spend twenty percent of her time on the project. *Id.* These percentages were contained in the Coast Guard's preexisting template, and Ms. Broussard did not

---

(b) If the Government terminates the Contractor's right to proceed, liquidated damages will continue to accrue until the work is completed. These liquidated damages are in addition to excess costs of repurchase under the Termination clause.

Pl.'s App. 26.

**3.** All citations to the FAR refer to the version in effect on the date the Coast Guard placed its order with plaintiff.

know their origin. *Id.* at 224–25, 228–29. Ultimately, by dividing each annual amount by twelve, Ms. Broussard calculated monthly costs of $583 each for the Construction Division and Contracting Division chiefs, $513 for the team leader, $3,386 for the project manager, $1,026 for the contracting officer, and $1,739 for the contract specialist, arriving at a total monthly cost of $7,830 for the second category. *Id.* at 146.

As the final step of her process, Ms. Broussard divided the sum of the monthly costs for the two categories by thirty days to calculate the daily liquidated damages rate of $551. *Id.* At no point did Ms. Broussard make a specific written determination concerning the impact that a liquidated damages clause would have on pricing, competition, and contract administration. *Id.* at 215, 228–29. Nor did she document any consideration of the importance of the time of delivery or timely performance when determining that a liquidated damages clause was necessary. *Id.* at 220, 228–29.

**B. Contract Performance**

As set forth in the contract, the Coast Guard contemplated that plaintiff would design the building based on the contract specifications, submit the design to the Coast Guard in two phases (a "100% design" and a "final design"), and then, upon the Coast Guard's approval of the final design, begin construction. *See generally id.* at 37–121 (containing the contract specifications); Def.'s App. 2 (containing minutes of the postaward kickoff meeting). The design and construction of the building were to be completed no more than 262 days after contract award. Pl.'s App. 20.

One aspect of the work to be performed by plaintiff was the design and installation of heating, ventilation, and air conditioning ("HVAC") systems "to accommodate all building operations." *Id.* at 62. The HVAC systems were to be designed to maintain a specified temperature and percentage of relative humidity. *Id.* Among the HVAC work required was the provision of air conditioning in the building's test labs, *id.,* including a room to house existing, identified hydraulic test equipment ("hydraulic test lab"), *see, e.g., id.* at 56, 64, 175. In addition, plaintiff was required to disconnect an existing chiller from hydraulic test equipment situated in another building, relocate the chiller and the equipment to the new building, reconnect the chiller to the equipment, and run new distribution piping. *Id.* at 64.

Work on the project did not begin within the time anticipated in the contract. The Coast Guard postponed the postaward kickoff meeting, which should have occurred between fourteen and twenty-eight days after contract award, to December 4, 2003. *Id.* at 72, 167, 170; Def.'s App. 1–2. In addition, plaintiff encountered delays in the delivery of the building due to worldwide steel shortages. Pl.'s App. 167, 169–70. Plaintiff also required additional time in which to coordinate the connection of government-owned equipment, some of which was different from the equipment listed in the contract specifications. *Id.* at 168, 170. Plaintiff asserted that this latter problem delayed its mechanical and electrical designs. *Id.* at 168. The Coast Guard recommended that the contract completion date be extended by 105 days to account for all of these delays. *Id.* at 167, 170. *But see* Def.'s App. 9 (informing plaintiff that it was plaintiff's responsibility to conduct field investigations regarding government-owned equipment), 11 (containing plaintiff's acknowledgment that it was its "responsibility to investigate and develop[ ] the design"), 20 (containing an April 8, 2004 electronic-mail message from the Coast Guard's design project manager reciting a chronology of events and indicating that the chronology "reflects the mismanagement by [plaintiff] that has put the project in the current situation"). Subsequently, in an April 15, 2004 bilateral contract modification, the contract completion date was extended by 126 days to October 21, 2004. Pl.'s App. 131–32.

A new contracting officer, Marion E. Hundley,[4] sent plaintiff a cure letter on May

---

4. It appears from the record that three individuals acted as the contracting officer for this project at various times: Ms. Broussard, Ms. Hundley, and Victoria W. Worrell. *See, e.g.,* Pl.'s App. 131 (containing a contract modification signed by Ms. Broussard on February 26, 2004), 133 (containing a contract modification signed by Ms. Hundley on September 9, 2004), 171 (repre-

6, 2004, warning that plaintiff's "failure to submit a proper progress schedule and failure to perform any work on site was endangering the performance of [the] contract." *Id.* at 186. Plaintiff responded to the cure letter on May 16, 2004, describing its progress in various aspects of the project. *Id.* It explained that it was "refining [its] construction schedule with supplies and subcontractors and would submit the schedule on May 20, 2004." *Id.* It further indicated that it had "completed the layout of the building" and was "coordinating" with the Coast Guard regarding the "the location of existing utilities." *Id.* In addition, plaintiff asserted that it "planned to start site work and installation of the building pad on May 18, 2004," and that, "once the foundation design was revised and approved," it was prepared to install the foundation. *Id.; see also* Def.'s App. 14 (reflecting that plaintiff began excavation work on May 24, 2004), 21 (indicating that on May 29, 2004, plaintiff mobilized equipment and manpower on site, laid out the building, and began to excavate the footers). Finally, it stated that it was "inspecting the existing equipment to be relocated ... and ... holding on site discussions with the base personnel to evaluate the impact of the planned move." Pl.'s App. 186.

One month later, in a June 18, 2004 letter, Ms. Hundley advised plaintiff that its "mechanical design submittal had significant comments that had to be addressed prior to a re-submittal of the document." *Id.* Despite this design issue, the Coast Guard permitted plaintiff to proceed with construction after accepting plaintiff's structural foundation drawings on July 6, 2004. *Id.; see also id.* at 167 (reiterating, on March 4, 2004, that plaintiff could "'fast-track' building foundation work, etc. providing sufficient design information is provided to indicate that the structural design is adequate"); Def.'s App. 2 (noting the Coast Guard's offer, at the December 4, 2003 postaward kickoff meeting, to "accept the foundation design ahead of the building design, if it would help [plaintiff] 'fast-track' the construction phase"). Plain-

tiff began to erect the building's steel structure on July 30, 2004. Def.'s App. 25.

Meanwhile, on July 13, 2004, plaintiff submitted a Request for Information to the Coast Guard, reporting that its HVAC engineer discovered a potentially hazardous condition in the hydraulic test lab—the generation of an excessive heat load by the hydraulic test equipment—and requesting direction on how to deal with this condition in its design. *Id.* at 29; Pl.'s App. 165–66. In an accompanying letter, the HVAC engineer, based on his discussions with the Coast Guard's mechanical engineer, suggested two possible solutions that would be "acceptable to the Coast Guard": (1) removing the excess heat through the use of hoods and fans while cooling the air with a conditioning unit or (2) installing "an air conditioning system that is approximately 30% larger than the one serving the existing equipment layout." Pl.'s App. 166. The Coast Guard's mechanical engineer took exception to the HVAC engineer's letter, writing the following in a July 13, 2004 electronic-mail message to the Coast Guard's construction project manager:

First, [the relevant contract specification] indicates that K–CON is to provide HVAC to the facilities, and while it indicates the types of equipment that the user would like to see being used, [it] does not in any manner dictate how the spaces are to be treated. It states that HVAC is to be provided in accordance with [specified] mechanical codes. [The HVAC engineer's telephone call] yesterday was predicated on his requesting assistance in trying to resolve how to specifically treat the Hydraulic Test room (since he did not do a site visit).... At no time did I ever indicate that [the two options in his letter] were the only options acceptable .... I was trying to help him resolve a situation which he was not prepared to handle, but was not directing how it was to be done. The [relevant contract specification] clearly gives him the latitude to do it [with] other

senting that Ms. Broussard participated in a telephone conference with plaintiff on July 20, 2004), 175 (containing a July 23, 2004 letter to plaintiff signed by Ms. Worrell as the contracting

officer), 186 (representing that Ms. Hundley sent a cure letter to plaintiff on May 6, 2004), 193 (containing a contract modification signed by Ms. Worrell on March 29, 2006).

means, as long as it meets [the specified] standards.

Def.'s App. 6.

Plaintiff and Coast Guard personnel convened a telephone conference on July 20, 2004, to discuss plaintiff's Request for Information. Pl.'s App. 171. Plaintiff purported to memorialize the discussion that occurred during the conference call in an electronic-mail message sent to the Coast Guard later that day. *Id.* It described the conversation regarding the heat load of the hydraulic test equipment as follows:

> During our phone conference we discussed the design of the HVAC system for room 106. It is known our current and originally proposed and budgeted design will not work efficiently within this room. Additional calculations were conducted on room 106 due to the amount of heat generated by the 75hp motor and 25hp motor. After conducting those calculations our mechanical engineering group submitted two options that may be acceptable to the Coast Guard. As it was discussed both of those options are not inclusive of K–Con's original budgeted design nor our proposal based on the [solicitation] documents received by the [Coast Guard Facilities Design and Construction Center Atlantic]. It was discussed that K–Con needs an accurate operating schedule to correctly design the HVAC tonnage for room 106. We were told a more accurate schedule would be provided by Monday the 26th of next week. Once this information is received we will reevaluate the design and submit for final approval and/or a cost or no cost [change order].

*Id.* at 171–72. Plaintiff also noted that it had sent its 100% design package to the Coast Guard earlier that day. *Id.* at 172. As of the date of the conference call, plaintiff had approximately three months in which to complete the building. *See id.* at 132.

After the conference call, the Coast Guard gathered the information related to the operating schedule of the hydraulic test equip-

ment. *Id.* at 173–74. Upon receiving the collected information, one of the Coast Guard's project managers remarked: "[I]t looks as though we will be having a problem trying to cool this room with reasonably sized equipment." *Id.* at 173. The Coast Guard also reviewed plaintiff's 100% design package and prepared a list of comments in response. *Id.* at 175. The contracting officer, Ms. Worrell, forwarded the Coast Guard's comments to plaintiff on July 23, 2004, emphasizing that the comments were not to be considered changes to the contract. *Id.* In the cover letter accompanying the comments, Ms. Worrell stated:

> The HVAC system has some outstanding issues related to the hydraulic test lab that require resolution, and re-submittal of the mechanical design will be required before the documents are useable for construction. We feel that the resolution of these issues is ultimately [plaintiff]'s responsibility, but we want to assist in every way we can to resolve the "real" design requirements.

*Id.* She then indicated that once plaintiff had incorporated the Coast Guard's comments and submitted its final design, it could "proceed with all work other than that related to the HVAC system," and that once the design requirements of the HVAC system were resolved, the mechanical drawings could be incorporated into the final design. *Id.*

More than a month later, the parties agreed to a contract modification, effective September 9, 2004, increasing the contract price to $551,155.35 to compensate plaintiff for its installation of sound attenuation blankets above three of the rooms in the building, including the hydraulic test lab. *Id.* at 135–36. But, as of September 10, 2004, the issues with the hydraulic test lab's HVAC system had not been resolved.[5] *Id.* at 180. As a result, one of the Coast Guard's project managers expressed the need to consult with plaintiff about the operating schedule of the hydraulic test equipment and how to best condition the lab because without this infor-

---

5. According to electronic-mail messages exchanged by Coast Guard personnel, the delay may have been partly attributable to plaintiff waiting for approval of a contract modification and the Coast Guard's plan to fund the cost of a mechanical engineer's field visit as part of the proposed modification. Pl.'s App. 180. The modification was ultimately rejected. *Id.*

mation, plaintiff could not "finalize" its design. *Id.* In an electronic-mail message scheduling a telephone conference, plaintiff's project manager wrote: "The amount of tonnage currently designed is based on the [request for quotations]. Any additional tonnage or change in design ... may result in additional cost and time which will require [a request for quotations] from contracting." *Id.* at 181.

On September 20, 2004, plaintiff sent a progress schedule to the Coast Guard indicating a completion date of December 8, 2004, forty-three days beyond the then-contract completion date of October 26, 2004. *Id.* at 186. Ms. Hundley noted the discrepancy in a September 22, 2004 forbearance letter. *Id.* Subsequently, in a November 10, 2004 bilateral contract modification, the completion date was extended, for the final time, to November 9, 2004, due to a supplier's shipping delay. *Id.* at 137–38. Given that plaintiff had previously anticipated completing the building on December 8, 2004, it remained unable to meet the contract completion date. Nevertheless, despite noting plaintiff's "failure to make progress and ... inability to complete the contract by the bilaterally agreed completion date," the Coast Guard "determined it was in the best interest of the Government to forbear from terminating [plaintiff's] contract for default...." *Id.* at 187. The Coast Guard permitted plaintiff to continue work on the project, but indicated its intention to assess liquidated damages at the contract rate of $551 per day for "any delay beyond the contract completion date...." *Id.*

By November 19, 2004, plaintiff had erected the building's steel structure. Def.'s App. 25. It began installing the wall panels and insulation three days later. *Id. But see id.* at 22 (indicating that plaintiff began to "plac[e] insulation and sheeting on [the] back side sidewall" on November 17, 2004). It also began to hang sprinkler pipe in the building. *Id.* at 22–23. However, because the building was not yet completely enclosed, the Coast Guard's inspector noted that the sprinkler pipe might rust due to exposure to the elements. *Id.* at 23. The inspector also noted that the premature hanging of the sprinkler pipe would interfere with other work on the building. *Id.*

Although plaintiff was proceeding with the building's construction, Ms. Hundley sent plaintiff a show cause letter on December 9, 2004, noting that plaintiff's "failure to submit the final design documents within the time frame allowed and failure to provide adequate manpower for performing the work prevented [plaintiff] from completing" the project by the November 9, 2004 completion date. Pl.'s App. 187. Yet, at the same time, Coast Guard personnel were engaged in an internal discussion concerning the final mechanical design submitted by plaintiff. *Id.* at 182–83. It appears that plaintiff opted to remove the excess heat in the hydraulic test lab through the use of hoods and fans while cooling the air with a conditioning unit, *id.,* as previously suggested by its HVAC engineer, *id.* at 166. One of the Coast Guard's project managers noted that plaintiff had requested "additional compensation for hoods and exhausting of the lab equipment motors...." *Id.* at 182. He consulted with the Coast Guard's mechanical engineer, who opined that additional compensation was not warranted because "[b]y removing the heat given off by the motors, they have been able to reduce the HVAC equipment sizes," making it "a 'wash' or even a cost savings." *Id.*

Plaintiff responded to the Coast Guard's show cause letter on December 22, 2004, asserting that the Coast Guard contract requirements differed materially from the standard GSA Design/Build requirements and that its subcontractors would resume work on January 3, 2005. *Id.* at 187. Plaintiff then submitted a progress schedule to the Coast Guard on January 5, 2005, reflecting an anticipated completion date of March 19, 2005. *Id.* The Coast Guard noted "corrections to three line items" on the schedule that changed the anticipated completion date to April 26, 2005, and then, on January 12, 2005, sent plaintiff another forbearance letter. *Id.*

Plaintiff finished installing the wall panels and insulation on January 12, 2005, and began installing the roof the next day. Def.'s App. 25. It then started the electrical, mechanical, and plumbing rough-ins on January

17, 2005.[6] *Id.* However, on February 2, 2005, Ms. Hundley issued a second show cause letter to plaintiff, remarking that plaintiff's "failure to submit the final design documents by January 21, 2005, failure to complete the roofing installation by January 19, 2005, failure to remove the rejected wet insulation, and failure to provide adequate manpower" would prevent plaintiff from meeting its anticipated completion date of April 26, 2005. Pl.'s App. 187. Plaintiff responded to this show cause letter on February 7, 2005, describing its reasons for not installing the roof and averring that it would deliver the final design documents by February 10, 2005. *Id.*

Plaintiff did not deliver the design documents until February 18, 2005. *Id.* On February 25, 2005, in a letter signed by Ms. Hundley, the Coast Guard provided its comments to plaintiff regarding its mechanical design. *Id.* at 184–85. One of the comments concerned the hydraulic test lab: "Room 106 (Hydraulic Lab): Contract requires the ceiling height to be 10 feet above finished floor (AFF). It is unacceptable that the proposed HVAC ducting dimensions and related accessories such as insulation and duct hangers will not fit above the ceiling." *Id.* at 184. At the end of the letter, Ms. Hundley reiterated that the Coast Guard's comments were not changes to the contract. *Id.* at 185. She then informed plaintiff that it could proceed with the work, provided that the comments were addressed and that sealed drawings were provided to the Coast Guard. *Id.*

Despite its direction to plaintiff to proceed with the work, the Coast Guard, less than a month later, issued a Notice of Termination of Default, effective March 17, 2005. *Id.* at 139, 186–89. It noted both plaintiff's failure "to meet any of the schedules [it had] submitted" and the lack of Coast Guard-caused "delays that would extend the completion date beyond November 9, 2004." *Id.* at 188. Accordingly, it determined that "it [was] no longer in the best interest of the Government to forbear termination for default for [plaintiff's] failure to complete [the project] within the established completion date." *Id.* Pursuant to the contract's default clause, the Coast Guard expressly reserved the right to recover any excess costs incurred in completing the building, along with the right to assess liquidated damages. *Id.* (citing FAR 52.249–10, Default (Fixed–Price Construction) (Apr. 1984)); *accord id.* at 139.

## C. Reprocurement

At the time of the default termination, the Coast Guard had paid $287,551.39 to plaintiff. *Id.* at 139. In the October 24, 2005 contract modification formalizing the default termination, the Coast Guard indicated its intent to use the unpaid balance of the contract— $263,603.96—to fund the reprocurement of the project, and reiterated its intent to claim any costs incurred in excess of the unpaid balance from plaintiff. *Id.* It also reiterated its intent to assess liquidated damages, which would accrue until the building was substantially complete. *Id.*

On November 7, 2005, almost eight months after it terminated its contract with plaintiff, the Coast Guard entered into an agreement with Viteri Construction Management Incorporated ("Viteri") to complete the building. *Id.* at 190. In the new contract's scope of work section, the Coast Guard represented to Viteri that the building design was ninety-five percent complete. *Id.* at 198; *cf.* Def.'s App. 16–19 (listing the site work that had not yet been completed as of March 22, 2005). As with the initial contract awarded to plaintiff, the Coast Guard's contract with Viteri contained a liquidated damages clause. *See* Pl.'s App. 151–52. The specified rate of liquidated damages, $434 per day, was based on a memorandum prepared by Ms. Hundley in August 2005. *Id.* The initial contract price was $721,431, and the initial completion date was March 19, 2006. *Id.* at 190. Through bilateral contract modifications, the contract price was ultimately increased to $814,619 and the completion date was ultimately extended to August 26, 2006. *Id.* at 193–96. The Coast Guard determined that Viteri substantially completed the building as of September 20, 2006. *Id.* at 199.

---

**6.** There is no evidence in the record indicating whether plaintiff began work on all three systems simultaneously or whether it began work on just one or two of the systems.

## D. Procedural History

Plaintiff filed suit in this court on August 25, 2005, seeking to convert the default termination into a termination for the government's convenience and the remission of retained liquidated damages. Compl. 3–4. Defendant filed a counterclaim, alleging that the Coast Guard had withheld approximately $10,220 from payments to plaintiff as liquidated damages and seeking the balance of liquidated damages as measured from the November 9, 2004 contract completion date to the date the building was completed. Countercl. 7. Upon the close of discovery, plaintiff filed the instant motion, and the court heard argument on January 11, 2011.

## II. DISCUSSION

Plaintiff moves for summary judgment solely on the issue of liquidated damages, arguing first that the rate of liquidated damages specified in its contract with the Coast Guard constitutes an unenforceable penalty, and second, in the alternative, that it is entitled to a remission of liquidated damages due to excusable delay.

### A. Motions for Summary Judgment

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. R. Ct. of Fed. Cl. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue is genuine if it "may reasonably be resolved in favor of either party." *Id.* at 250, 106 S.Ct. 2505.

The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. 2548. The moving party may discharge its burden by "pointing out ... that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S.Ct. 2548. The moving party is not required to support its application with affidavits, but instead may rely solely on the pleadings, depositions, answers to interrogatories, and admissions. *Id.* at 324, 106 S.Ct.

2548. The nonmoving party then bears the burden of showing that there are genuine issues of material fact for trial. *Id.* The nonmoving party must go beyond the pleadings and support its opposition with affidavits or with depositions, answers to interrogatories, and admissions. *Id.*

The court must view the inferences to be drawn from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Entry of summary judgment is mandated, "after adequate time for discovery," against a party who fails to establish "an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322, 106 S.Ct. 2548.

### B. Enforceability of Liquidated Damages Clauses

Liquidated damages are used "to allocate the consequences of a breach before it occurs," *Jennie–O Foods, Inc. v. United States*, 580 F.2d 400, 412 (Ct.Cl.1978) (per curiam), which "save[s] the time and expense of litigating the issue of damages," *DJ Mfg. Corp. v. United States*, 86 F.3d 1130, 1133 (Fed.Cir.1996). Liquidated damages "serve a particularly useful function when damages are uncertain in nature or amount or are unmeasurable, as is the case in many government contracts." *Priebe & Sons, Inc. v. United States*, 332 U.S. 407, 411, 68 S.Ct. 123, 92 L.Ed. 32 (1947). Thus, "[w]here parties have by their contract agreed upon a liquidated damages clause as a reasonable forecast of just compensation for breach of contract and damages are difficult to estimate accurately, such provision should be enforced." *Jennie–O Foods, Inc.*, 580 F.2d at 413–14; *see also* FAR 11.501 (noting that use of a liquidated damages clause is proper if damages "would be difficult or impossible to estimate accurately or prove" and that the "rate must be a reasonable forecast" of the anticipated damages).

On the other hand, courts will not enforce a liquidated damages clause when the amount of liquidated damages is "plainly without reasonable relation to any probable

damage which may follow a breach," *Kothe v. R.C. Taylor Trust*, 280 U.S. 224, 226, 50 S.Ct. 142, 74 L.Ed. 382 (1930), or is "so extravagant, or so disproportionate to the amount of property loss, as to show that compensation was not the object aimed at or as to imply fraud, mistake, circumvention, or oppression," *Wise v. United States*, 249 U.S. 361, 365, 39 S.Ct. 303, 63 L.Ed. 647 (1919). In these circumstances, liquidated damages amount to a penalty. *Priebe & Sons, Inc.*, 332 U.S. at 413, 68 S.Ct. 123; *United States v. Bethlehem Steel Co.*, 205 U.S. 105, 118–21, 27 S.Ct. 450, 51 L.Ed. 731 (1907).

When presented with a challenge to a liquidated damages clause, a court must judge the clause "as of the time of making the contract" and without regard to the amount of damages, if any, actually incurred by the nonbreaching party. *Priebe & Sons, Inc.*, 332 U.S. at 412, 68 S.Ct. 123; *accord Bethlehem Steel Co.*, 205 U.S. at 119, 27 S.Ct. 450 (noting that courts will enforce liquidated damages clauses "without proof of the damages actually sustained"); *Steve Kirchdorfer, Inc. v. United States*, 229 Ct.Cl. 560, 565–67 (1981) (upholding an award of liquidated damages although no actual damages were sustained); *Young Assocs., Inc. v. United States*, 471 F.2d 618, 622 (Ct.Cl.1973) ("It is enough if the amount stipulated is reasonable for the particular agreement at the time it is made."). The party challenging a liquidated damages clause—typically, in government procurement cases, the contractor—bears the burden of proving that the clause is not a penalty. *DJ Mfg. Corp.*, 86 F.3d at 1134; *Jennie–O Foods, Inc.*, 580 F.2d at 414. The burden is a heavy one "because when damages are uncertain or hard to measure, it naturally follows that it is difficult to conclude that a particular liquidated damages amount or rate is an unreasonable projection of what those damages might be." *DJ Mfg. Corp.*, 86 F.3d at 1134. And because of this difficulty, it is generally improper for a court

"to inquire into the process that the contracting officer followed in arriving at the liquidated damages figure that was put forth in the solicitation and agreed to in the contract." *Id.* at 1137; *see also id.* at 1136 (noting that courts will enforce a liquidated damages clause, "regardless of how the liquidated damage figure was arrived at," if the amount of liquidated damages is reasonable).

In this case, plaintiff does not challenge the propriety of including a liquidated damages clause in its contract with the Coast Guard.[7] Rather, in this phase of the litigation, it focuses on the reasonableness of the liquidated damages rate set forth in the clause, contending that a rate of $551 per day is a penalty because it "bears no reasonable relationship to any additional costs the [Coast Guard] could have reasonably anticipated in the event the Contract was delayed...." Mot. 8. Specifically, plaintiff argues that the Coast Guard's calculation of the liquidated damages rate was arbitrary and unsupported, and that some components of the rate should not have been included.

Before it addresses plaintiff's arguments, the court directs its attention to defendant's assertion that those arguments are untimely because a challenge of a liquidated damages clause is permitted only at the time of contract formation. As the court explains below, the case law defendant relies upon fails to support its position.

The principal decision upon which defendant relies is *P & D Contractors, Inc. v. United States*, 25 Cl.Ct. 237, *aff'd mem.*, 985 F.2d 583 (Fed.Cir.1992). In that case, the United States Claims Court ("Claims Court") held: "Reasonableness [of the liquidated damages] ... is to be determined at the time of [contract] execution. [The contractor] failed to argue the reasonableness of the liquidated damages at the time it executed the contract. Therefore, [the contractor] is

---

**7.** Nevertheless, plaintiff notes that Ms. Broussard, before deciding to include a liquidated damages clause in the contract, did not (1) make specific findings concerning the potential impact that the use of a liquidated damages clause might have on pricing, competition, and contract administration or (2) document that she considered the importance of delivery time or timely performance. Plaintiff implies that Ms. Broussard's failure to take these actions violated the FAR. However, because plaintiff does not challenge the use of a liquidated damages clause in its contract with the Coast Guard per se, these particular facts are irrelevant.

foreclosed from doing so now." [8] *Id.* at 241 (citation omitted). The court cited another decision from the Claims Court—*Cegers v. United States*—in support of its holding. *Id.* The Claims Court in *Cegers* "recognize[d] . . . the rule of law that the reasonableness of a stipulated liquidated damages amount should be determined at the time a contract is executed." 7 Cl.Ct. 615, 620 (1985). As noted in *P & D Contractors, Inc.*, the *Cegers* court relied on the United States Supreme Court's ("Supreme Court") decision in *Priebe & Sons, Inc.* as the source of this "rule of law."

■ Accordingly, it is apparent that the legal principle advanced in *P & D Contractors, Inc.* can be directly traced back to *Priebe & Sons, Inc.*, in which, as noted above, the Supreme Court provided that a court must judge a liquidated damages clause "*as of* the time of making the contract." [9] 332 U.S. at 412, 68 S.Ct. 123 (emphasis added). This binding precedent directs the court to examine the conditions that existed at the time of contract formation, but does not prevent the court from examining those conditions after a breach has occurred, which may be several years later. Defendant has not cited any binding precedent that takes a contrary position. Thus, to the extent that certain nonbinding decisions of the Claims Court might be construed to suggest that a liquidated damages clause may only be challenged at the time of contract formation, this court declines to follow that reasoning.

■ Returning to plaintiff's motion, the court first addresses plaintiff's assertion that the liquidated damages rate is arbitrary. To support its view, plaintiff compares the rate to the rates in the St. Petersburg contract, the Port Huron contract, and the Elizabeth City reprocurement contract. The table below summarizes the contents of the liquidated damages memoranda prepared by Ms. Broussard and Ms. Hundley prior to the Coast Guard's solicitation of proposals for each project: [10]

| Item of Liquidated Damages | Elizabeth City (original) | Elizabeth City (reprocurement) | St. Petersburg | Port Huron |
| --- | --- | --- | --- | --- |
| **Item 2: Monthly Travel/Per Diem, Inspection & Miscellaneous Costs** | | | | |

8. It bears noting that notwithstanding this statement, the Claims Court did, in fact, analyze whether the liquidated damages clause at issue was reasonable. *See P & D Contractors, Inc.*, 25 Cl.Ct. at 240–41. Indeed, earlier in the decision the court held that "the liquidated damages provision in this case, and the liquidated damages set out in NAVFAC P–68 on which it is based, are reasonable," *id.* at 240, and after it ruled on timeliness, it held that "the liquidated damages provision in this case meets the reasonableness requirement . . . and, consequently, the provision was enforceable," *id.* at 241. Thus, the timing of plaintiff's challenge was not the primary nor the sole reason for the court's upholding of the liquidated damages clause.

9. A similar situation is found in another decision relied upon by defendant, *Mega Construction Co. v. United States*, 29 Fed.Cl. 396 (1993). In that case, the United States Court of Federal Claims provided that it was required to determine the reasonableness of liquidated damages "at the time the contract was executed rather than when the contract was breached or at some other subsequent time." *Id.* at 502. In support of this principle, the court cited *P & D Contractors, Inc.*, discussed above, and *United States v. Le Roy Dyal Co.*, 186 F.2d 460, 462 (3d Cir.1950), which cites *Priebe & Sons, Inc.* for the proposition that "the [liquidated damages] provisions are to be judged as of the time of making the contract." Thus, the court's statement and reasoning in *Mega Construction Co.* can also be traced back to *Priebe & Sons, Inc.* Moreover, the court's subsequent analysis of the contractor's challenge of the liquidated damages clause reveals that it was not concerned with the timeliness of the challenge, but with the conditions that existed at the time the parties executed the contract. *See Mega Constr. Co.*, 29 Fed.Cl. at 502 (holding that the contractor "did not demonstrate that the assessment of liquidated damages was unwarranted, contrary to law, or unreasonable in the light of the circumstances existing at the time the parties entered into the contract").

10. The table describes the "Item 2" and "Item 3" components of the liquidated damages rate. There is no "Item 1" component; the first part of each liquidated damages memorandum contains the contracting officer's findings that a liquidated damages clause should be included in the contract.

| | | | | |
|---|---|---|---|---|
| Travel to Job Site for Project Manager[11] | $ 41 | $ 0 | $ 700 | $ 700 |
| Travel to Job Site for One Contracting Staff Member[12] | $ 0 | $ 0 | $ 650 | $ 650 |
| Construction Inspector Time | $ 8,444 | $ 5,000 | $10,000 | $10,000 |
| Miscellaneous Costs (mail, telephone, etc.) | $ 200 | $ 200 | $ 200 | $ 200 |
| Total for Item 2 | $ 8,685 | $ 5,200 | $11,550 | $12,339[13] |

Item 3: Monthly Administrative Costs for Government Representatives

| | | | | |
|---|---|---|---|---|
| Construction Division Chief | $ 583 | $ 583 | $ 583 | $ 583 |
| Team Leader | $ 513 | $ 513 | $ 478 | $ 478 |
| Project Manager | $ 3,386 | $ 3,386 | $ 2,755 | $ 2,755 |
| Contracting Division Chief | $ 583 | $ 583 | $ 583 | $ 583 |
| Contracting Officer | $ 1,026 | $ 1,026 | $ 957 | $ 957 |
| Contracting Specialist | $ 1,739 | $ 1,739 | n/a | n/a |
| Total for Item 3 | $ 7,830 | $ 7,830 | $ 5,356 | $ 5,356 |

| | | | | |
|---|---|---|---|---|
| Grand Total for Items 2 and 3 | $16,515 | $13,030 | $16,906 | $17,695 |
| Daily Rate | $ 551 | $ 434 | $ 564 | $ 590 |

*See* Pl.'s App. 145–52. In its motion, plaintiff contends that Ms. Broussard and Ms. Hundley, when determining the various components of the liquidated damages rates for the different projects, inconsistently and arbitrarily used different amounts for the same categories. Specifically, plaintiff complains about the inconsistencies in the "Construction Inspector Time" and "Travel to Job Site for One Contracting Staff Member" categories.[14] With respect to the former category, plaintiff argues that there is no reasonable basis to assign $10,000 per month for inspection services in St. Petersburg and Port Huron, while assigning only $8,444 or $5,000 for inspection services in Elizabeth City. With respect to the latter category, plaintiff questions the inclusion of a contracting official in item 3 because there are no associated travel costs in item 2 for a contracting official, and also questions why a contracting official is

11. Ms. Broussard indicated that the $700 figure for the St. Petersburg project was based on costs of $384 for the per diem, $105 for the car rental, and $243 for the airfare, which actually total $732. Pl.'s App. 147. She also indicated that the $700 figure for the Port Huron project was based on costs of $384 for the per diem, $105 for the car rental, and $300 for the airfare, which actually total $789. *Id.* at 149. Further, the $41 figure for the Elizabeth City project represented the cost of driving 120 miles at $0.34 per mile. *Id.* at 145.

12. Ms. Broussard indicated that the $650 figure for the St. Petersburg project was based on costs of $384 for the per diem and $243 for the airfare, which actually total $627. Pl.'s App. 147. She also indicated that the $650 figure for the Port Huron project was based on costs of $384 for the

per diem and $300 for the airfare, which actually total $684. *Id.* at 149. In both memoranda, she indicated that she did not include car rental costs in the $650 figure because those costs were included in the project manager's travel cost. *Id.* at 147, 149.

13. The basis for this figure is unclear as it is not the sum of $700, $650, $10,000, and $200, nor is it the sum of $789, $684, $10,000, and $200.

14. At oral argument, plaintiff retreated from its contention that the item 2 component of the liquidated damages rate was arbitrary or otherwise improper, stating that it does not contest the total amount calculated for item 2 by Ms. Broussard. Nevertheless, for the sake of completeness, the court addresses plaintiff's argument.

required to travel to St. Petersburg and Port Huron, but not to Elizabeth City.

There are at least two difficulties with plaintiff's contentions. First, the court cannot determine whether the value of a particular component of a liquidated damages rate is proper, *e.g.*, whether construction inspector time should be valued at $10,000, $8,444, or $5,000, based solely on the fact that different values were used for the component on different projects. It is plaintiff's burden to establish that the rate of liquidated damages is unreasonable. *DJ Mfg. Corp.*, 86 F.3d at 1134. Moreover, plaintiff must establish that the rate is unreasonable for the particular contract that imposes the rate. *Young Assocs., Inc.*, 471 F.2d at 622. Thus, if plaintiff's position is that a liquidated damages rate is unreasonable because a component of the rate is improper, it must prove that the component amount is improper as it relates to the particular contract at issue. In other words, it is plaintiff's burden to demonstrate that the Coast Guard could not have expected, at the time the parties executed the Elizabeth City contract, to spend $8,444 per month on inspection services if the project was delayed. Merely asserting that $8,444 per month is unreasonable because the Coast Guard used different amounts for different projects does not suffice.[15] The second difficulty is that the court's sole concern is whether the liquidated damages rate in the initial Elizabeth City contract is reasonable; consequently, a line-by-line comparison of the

components of the rates described in liquidated damages memoranda prepared for other contracts provides little assistance.[16] *See id.* In sum, as a matter of law, the court must reject plaintiff's suggestions of arbitrariness.[17]

Plaintiff next challenges Ms. Broussard's inclusion of administrative costs as a component of the liquidated damages rate. As described above, the challenged administrative costs are the costs for the time of the Coast Guard officials involved in the contract's administration and performance. Plaintiff contends that because these officials would have received their pay and benefits regardless of the status of the contract, their pay and benefits could not be recovered as damages in the event of a breach, and therefore could not be a component of the liquidated damages rate. Defendant responds that the Coast Guard properly included these costs as probable damages, explaining that if the contractor breached the contract, the specified Coast Guard officials would be required to spend more time and resources on the project than they originally anticipated. This, in turn, would divert them from their work on other projects, which could ultimately result in the need to hire additional personnel.

■ At oral argument, plaintiff provided an additional justification for its contention that the challenged administrative costs could not be damages.[18] Specifically, plain-

---

**15.** Moreover, plaintiff offers no explanation why a difference in the amount assigned for construction inspector time for each project, in and of itself, is arbitrary. Merely because the assigned amounts are different for the various projects does not prove that the contracting officer lacked a rational reason for the difference. Indeed, the differences in the assigned amounts for the separate projects may be attributable to any number of reasons, including the scope, complexity, and location of each project, just to name three possibilities.

**16.** And, to the extent that a comparison of liquidated damages rates is appropriate, the court notes that the rates for each of the three original contracts fall within a $39 range, which may be evidence of consistency and nonarbitrariness, if not reasonableness.

**17.** As an aside, the court notes that plaintiff's concerns with the "Travel to Job Site for One

Contracting Staff Member" category have little merit. The court could reasonably conclude that a contracting official for the Elizabeth City project would travel to the project site in the same car as the project manager, thus obviating the need to assign travel costs for the contracting official. This reasonable, common-sense supposition also demonstrates the likelihood that a contracting official was required to travel to the project sites in Elizabeth City, St. Petersburg, and Port Huron, and not just the latter two cities.

**18.** The court is not required to address legal theories proffered for the first time at oral argument. *See L-3 Commc'ns EOTech, Inc. v. United States*, 87 Fed.Cl. 656, 659 n. 2 (2009) ("Plaintiff must not be allowed to advance new legal theories at oral argument, prejudicing defendant."); *see also SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1319 (Fed.Cir.2006) ("[A]rguments not raised on the opening brief are

tiff characterized the challenged administrative costs as overhead and compared the costs with the overhead that a contractor might recover as damages in the case of a government-caused delay. It conceded that contractors are entitled to recover extended overhead as delay damages in appropriate situations, but argued that the type of administrative costs at issue in this case are not recoverable overhead because pay and benefits that are paid regardless of the existence of a delay can never be classified as costs incurred due to a delay. In sum, contended plaintiff, because a contractor could not receive the challenged administrative costs as delay damages, the Coast Guard could not recover them as a component of liquidated damages.

██ There is no question that, as a general rule, a contractor can recover extended overhead as damages for government-caused delay. *See, e.g., Cmty. Heating & Plumbing Co. v. Kelso*, 987 F.2d 1575, 1581 (Fed.Cir. 1993) ("[A] government contractor may recover extended home office overhead during periods of government-caused delay."); *George Sollitt Constr. Co. v. United States*, 64 Fed.Cl. 229, 242 (2005) ("Extended field office overhead also may sometimes be recovered as delay damages."). Extended overhead may include personnel costs such as pay and benefits. *See C.B.C. Enters., Inc. v. United States*, 978 F.2d 669, 672 (Fed.Cir. 1992) ("Home office overhead includes the cost of such items as weekly payrolls [and]

salaries . . . ."); *cf.* FAR 31.105(d)(3) ("Costs incurred at the job site incident to performing the work, such as the cost of superintendence, timekeeping and clerical work, engineering . . ., etc., are allowable as direct or indirect costs . . . ."); FAR 31.205–6(a) (noting that "[c]ompensation for personal services" is an allowable contract cost). Thus, to the extent that a contractor can demonstrate that it incurred personnel costs as a result of the government's delay, it is entitled to recover them as delay damages. *See Cornell Wrecking Co. v. United States*, 184 Ct. Cl. 289, 297–98 (1968) (per curiam) (allowing a contractor to recover the costs of the extra work done by a supervisor that resulted from the government's delay); *Luria Bros. & Co. v. United States*, 369 F.2d 701, 704–05 (Ct.Cl. 1966) (allowing a contractor to recover "field supervision" costs resulting from the government's delay); *Wilner v. United States*, 23 Cl.Ct. 241, 258–60 (1991) (allowing a contractor to recover field labor costs, *i.e.*, costs for the "extra hours worked by plaintiff's superintendent," as well as extended home office overhead, *i.e.*, the contractor's salary, resulting from the government's delay). If a contractor can recover personnel costs as damages for delay, there is no reason to deny the government the same right.[19]

Nevertheless, plaintiff objects that the personnel costs included in the liquidated damages rate would remain unaffected by any delay it caused, and therefore there is no

waived."). Nevertheless, because defendant did not object to plaintiff's argument, the court will exercise its discretion and address it. *See id.* at 1320 n. 9 ("[T]his court nonetheless has discretion to consider arguments that are not properly raised in the opening brief.").

19. In the course of advancing another argument, plaintiff appears to contend that because the Coast Guard was not prevented from pursuing work on other contracts and did not need to hire additional personnel due to the delayed completion of the Elizabeth City building, the Coast Guard is not entitled to recover personnel costs as damages. In concurring with the judgment of the majority in *Capital Electric Co. v. United States*, Judge Friedman of the United States Court of Appeals for the Federal Circuit ("Federal Circuit") explicitly rejected such an argument:

[The government] argues that since the delay in performance ordinarily does not increase

the total amount of office overhead the contractor incurs in connection with the particular contract, but merely spreads it over a longer period, allowing the contractor to recover for such overhead for the period of delay would result in compensating the contractor for losses it did not actually incur. According to the government, the only situations in which a contractor may recover for such extended office overhead is where the delay in performance: (1) requires the contractor to hire additional personnel or incur other additional expenses; or (2) prevents the contractor from taking on other work it would have been able to assume had there not been the delay.

Although superficially plausible, the government's argument does not withstand more penetrating analysis based upon the theory on which extended office overhead is allowed as an element of delay damages.

729 F.2d 743, 747–48 (Fed.Cir.1984) (Friedman, J., concurring).

increase in overhead that could be attributable to such delay. The court is not persuaded. As plaintiff recognized at oral argument, the identified Coast Guard officials would be required to perform additional work if plaintiff caused a delay. This extra work has value that the Coast Guard is entitled to recover, and the pay and benefits of the officials charged with performing the additional work is a reasonable forecast of that value.

 Moreover, there is no question that the Coast Guard is entitled to include administrative costs as a component of liquidated damages. *Jennie–O Foods, Inc.*, 580 F.2d at 413 ("Administrative expenses . . . may also be considered and they may be particularly difficult of accurate estimation."); *Young Assocs., Inc.*, 471 F.2d at 621 (agreeing with the proposition that administrative expenses can be considered in calculating a liquidated damages rate); *Cegers*, 7 Cl.Ct. at 619 ("Potential administrative expenses . . . may also be considered."). In fact, these administrative costs include the precise type of costs to which plaintiff objects. *See Hogan Mech., Inc.*, ASBCA No. 21612, 78–1 BCA ¶ 13,164 (holding that personnel costs for engineers, contracting officials, lawyers, and clerical staff who were all "permanent employees" of the contracting agency and "would be used and paid regardless of whether [the contractor] completed its contract on time or late" were "properly the subject of a liquidated damages computation"). Accordingly, as a matter of law, the court rejects plaintiff's attempt to exclude the identified administrative costs from the Coast Guard's liquidated damages calculation.

Even if the administrative costs are properly included in the liquidated damages rate, argues plaintiff, the costs used by Ms. Broussard are flawed, and therefore do not reflect a reasonable forecast of the Coast Guard's damages. The first flaw plaintiff identifies concerns the percentages used by Ms. Broussard to calculate the amount of Coast Guard personnel resources attributable to the Elizabeth City project. Plaintiff contends that because Ms. Broussard did not know how the percentages had been derived originally, the percentages are unsupported and therefore

unreasonable. The second flaw, according to plaintiff, is that Ms. Broussard based the administrative costs on a Coast Guard instruction that is not to be used as the basis for calculating liquidated damages rates. Plaintiff asserts that the express language of the instruction itself prohibits such a use. *See* COMDTINST 7310.1G at 2 (noting that the described standard rates "should not be used to calculate reimbursement of . . . foreseeable costs related to contracting actions"). The third flaw noted by plaintiff is that even if Ms. Broussard was entitled to base the administrative costs on the Coast Guard instruction, those rates improperly included the costs of overhead and benefits, which would have been incurred regardless of the status of the contract.

 None of the these purported flaws can provide the basis for challenging the liquidated damages rate set forth in the contract. The Federal Circuit has explained that so long as a liquidated damages rate is reasonable, a court should not "inquire into the process that the contracting officer followed in arriving at the liquidated damages figure that was put forth in the solicitation and agreed to in the contract." *DJ Mfg. Corp.*, 86 F.3d at 1137. It necessarily follows that, to the extent that a particular component of a liquidated damages rate can be challenged, so long as the component amount is reasonable, the court should not examine how that amount was determined. In other words, there is no legal basis for the court to reject Ms. Broussard's use of particular percentages, reliance on a particular Coast Guard instruction, or use of particular rates from that instruction. And, plaintiff has provided no evidence that the monthly costs assigned by Ms. Broussard—$583 each for the Construction Division and Contracting Division chiefs, $513 for the team leader, $3,386 for the project manager, $1,026 for the contracting officer, and $1,739 for the contract specialist—were unreasonable without regard to how those amounts were derived. All that plaintiff has contended is that Ms. Broussard improperly determined these costs. As a matter of law, such contentions are insufficient.

Overall, plaintiff's legal arguments cannot support a challenge to the liquidated damages rate set forth in its contract with the Coast Guard. As a result, plaintiff has failed to establish that the liquidated damages rate of $551 per day is an unreasonable forecast of the damages that the Coast Guard would sustain in the event of plaintiff's breach. The contracted-for liquidated damages clause is therefore enforceable. Thus, the court must address plaintiff's second contention— that it is entitled to a remission of liquidated damages due to excusable delay.

## C. Excusable Delay

Federal procurement law provides that the government cannot assess damages against a contractor for a failure to timely complete work under a contract if "[t]he delay in completing the work arises from unforeseeable causes," such as acts of the government or delays of subcontractors or suppliers, that are "beyond the control and without the fault or negligence of the Contractor." FAR 52.249–10(b)(1). To result in an excusable delay, "the unforeseeable cause must delay the overall contract completion; *i.e.*, it must affect the critical path of performance."[20] *Sauer Inc. v. Danzig*, 224 F.3d 1340, 1345 (Fed.Cir.2000). A contractor seeking the remission of liquidated damages on account of excusable delay bears the burden of proving "the extent of the excusable delay to which it is entitled." *Id.* at 1347.

Plaintiff generally contends that it is entitled to a finding of excusable delay because the delays for which it was responsible were concurrent with delays attributable to the Coast Guard and that these concurrent delays cannot be apportioned between the two parties. Plaintiff's contention reflects the

rule that, in the event of concurrent delay, neither the contractor nor the government "can recover damage, unless there is in the proof a clear apportionment of the delay and the expense attributable to each party." *Coath & Goss, Inc. v. United States*, 101 Ct.Cl. 702, 715 (1944); *accord Blinderman Constr. Co. v. United States*, 695 F.2d 552, 559 (Fed.Cir.1982) (noting, in circumstances where a contractor is seeking damages for the government's delay, that "courts will deny recovery where the delays are 'concurrent or intertwined' and the contractor has not met its burden of separating its delays from those chargeable to the Government"). Thus, to prevail on its argument, plaintiff must first establish that the Coast Guard caused a delay concurrent to its own.

Plaintiff claims that the undisputed facts demonstrate that the Coast Guard's specifications related to the hydraulic test lab were defective, which delayed plaintiff's ability to prosecute the work on the project. There is no question that "[w]hen the Government provides a contractor with design specifications, such that the contractor is bound by contract to build according to the specifications," a contractor that fully complies with the specifications is "not responsible for the consequences of defects in the specified design." *White v. Edsall Constr. Co.*, 296 F.3d 1081, 1084–85 (Fed.Cir.2002) (citing *United States v. Spearin*, 248 U.S. 132, 136, 39 S.Ct. 59, 63 L.Ed. 166 (1918)); *see also Essex Electro Eng'rs, Inc. v. Danzig*, 224 F.3d 1283, 1289 (Fed.Cir.2000) (stating that contractors are entitled to recover the costs "attributable to any period of delay that results from the defective specifications"). However, this implied warranty of specifications applies "only to design specifications

**20.** The United States Court of Claims described the critical path concept in the following manner:

[T]he critical path method is an efficient way of organizing and scheduling a complex project which consists of numerous interrelated separate small projects. Each subproject is identified and classified as to the duration and precedence of the work. (E.g., one could not carpet an area until the flooring is down and the flooring cannot be completed until the underlying electrical and telephone conduits are installed.) The data is then analyzed, usually by computer, to determine the most efficient

schedule for the entire project. Many subprojects may be performed at any time within a given period without any effect on the completion of the entire project. However, some items of work are given no leeway and must be performed on schedule; otherwise, the entire project will be delayed. These latter items of work are on the "critical path." A delay, or acceleration, of work along the critical path will affect the entire project.

*Haney v. United States*, 676 F.2d 584, 595 (Ct.Cl. 1982); *accord Wilner v. United States*, 24 F.3d 1397, 1399 n. 5 (Fed.Cir.1994) (en banc).

detailing the actual method of performance. It does not accompany performance specifications that merely set forth an objective without specifying the method of obtaining the objective." *Edsall Constr. Co.,* 296 F.3d at 1084; *see also Stuyvesant Dredging Co. v. United States,* 834 F.2d 1576, 1582 (Fed.Cir. 1987) ("Design specifications explicitly state how the contract is to be performed and permit no deviations. Performance specifications ... specify the results to be obtained, and leave it to the contractor to determine how to achieve those results.").

■ Because neither party addressed whether the specifications at issue were design specifications or performance specifications, the court cannot determine whether the Coast Guard caused a delay as a result of the purported defects in those specifications. But, even if the court was willing to conclude that the Coast Guard's specifications were design specifications, there is conflicting evidence regarding whether they were defective. Plaintiff recites the following facts in support of its contention that the Coast Guard provided defective specifications:

> K–Con requested information from the [Coast Guard ("USCG")] necessary to complete the design for the government furnished equipment to be installed by the USCG in Room 106. The USCG acknowledged that changes in the government furnished equipment and lack of information was delaying the design. On July 23, 2004, the contracting officer acknowledged there were outstanding issues with the hydraulic test lab that required resolution, and directed K–Con not to proceed with the work on the HVAC system, the critical system relating to Room 106. To resolve the problem, K–Con had to design special hoods and exhausting systems to capture the heat and hydraulic fluid that the equipment produced. K–Con advised the USCG that any change by the USCG in the design would result in additional costs and time. The USCG recognized that the design was different than the specifications required, but did not consider there to be any additional costs and did not address time.

Mot. 17 (citations omitted). In response, defendant presents the following facts:

> The contract required K–Con to design and build an aircraft component repair shop and administrative offices. Consistent with K–Con's design/build responsibilities, the contract required K–Con to design and develop a ventilation or HVAC system for the building. The contract also required K–Con to inspect and relocate certain existing equipment into room 106 of the new building. The contract stipulated that K–Con "shall coordinate the design and provide support, and utilities" for this relocated equipment. Because the contract provides that K–Con bore responsibility for developing an HVAC system, which would not only ventilate the building but also support the design and installation of Government-provided equipment, no change to the contract was required in order for K–Con to conform to the specifications contained in the contract.

Opp'n 22 (citations omitted). Defendant also asserts that the evidence in the record reflects that the Coast Guard "assisted K–Con's research and resolution of issues, although this work was the responsibility of K–Con." *Id.* at 26. By presenting evidence that plaintiff was responsible for the ultimate design of the hydraulic test lab's HVAC system and that the Coast Guard sought to assist plaintiff in meeting this responsibility, defendant has met its burden of showing that there are genuine issues of material fact concerning whether the specifications were defective. *See Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. 2548. Accordingly, plaintiff has not established that the Coast Guard caused a delay concurrent to its own.

Furthermore, if plaintiff had been able to establish that the Coast Guard caused a delay through the provision of defective specifications, it would still be required to prove that the Coast Guard delayed "the overall contract completion; *i.e.,* ... affect[ed] the critical path of performance." *Sauer Inc.,* 224 F.3d at 1345. Despite this unambiguous precedent requiring a contractor asserting an excusable delay to demonstrate that the delay occurred on the critical path, plaintiff contends, in its reply brief, that a critical

path analysis is unnecessary "because the undisputed facts demonstrate that [it] is entitled to" a finding of excusable delay for the relevant period of performance. Reply 13. Plaintiff further contends that even if such an analysis is necessary, its expert has opined that the issues surrounding the hydraulic test lab were "the main obstacle that prevented K–Con from finishing design and subsequent construction." Supplemental App. Pl.'s Reply 7. The court is disinclined to consider arguments and evidence raised for the first time in a reply brief. *See Smith-Kline Beecham Corp.*, 439 F.3d at 1319–20. This is particularly true when considering a motion for summary judgment, when the opposing party lacks the opportunity to respond and raise a genuine issue of material fact. *Novosteel SA v. United States*, 284 F.3d 1261, 1274 (Fed.Cir.2002) (noting, where plaintiff did not raise an argument in its "principal summary judgment brief," that "[r]aising the issue for the first time in a reply brief does not suffice; reply briefs reply to arguments made in the response brief—they do not provide the moving party with a new opportunity to present yet another issue for the court's consideration" and that, "[a]s a matter of litigation fairness and procedure," the argument must be treated as waived). Because plaintiff did not offer proof on an essential element of its claim of excusable delay in its motion for partial summary judgment, the court cannot grant summary judgment in its favor.

### III. CONCLUSION

For the reasons set forth above, the court **DENIES** plaintiff's motion for partial summary judgment. By **no later than Wednesday, February 23, 2011,** the parties shall file a joint status report suggesting further proceedings in this case.

Furthermore, in denying plaintiff's motion, the court has reached a number of legal conclusions regarding the enforceability of liquidated damages clauses and findings of excusable delay. These legal conclusions may affect the arguments advanced by the parties in their briefing of the pending dispositive motions in the St. Petersburg and Port Huron cases. Thus, the court will stay

its consideration of those dispositive motions to provide the parties with the opportunity to advise the court on how they would like to proceed. The court will issue appropriate orders in those cases.

**IT IS SO ORDERED.**